Filed 8/9/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| SURFRIDER FOUNDATION,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>MARTINS BEACH 1, LLC et al.,<br><br>      Defendants and Appellants. | A144268<br>A145176<br><br>(San Mateo County<br>Super. Ct. No. CIV520336) |

Nestled in a cove, sheltered on the north and south by high cliffs, Martins Beach lacks lateral land access.[1] The only practical route to Martins Beach is down a road, known as Martins Beach Road, that leads from Highway 1 in San Mateo County to the beach.

Appellants are two LLCs, Martins Beach 1, LLC and Martins Beach 2, LLC, that purchased Martins Beach and adjacent land including Martins Beach Road in July 2008. Respondent Surfrider Foundation (Surfrider) is a non-profit organization dedicated to the protection of oceans, waves, and beaches, including the preservation of access for recreation. A year or two after purchasing Martins Beach, appellants closed off the only public access to the coast at that site. Surfrider brought suit against appellants. The trial court held the California Coastal Act (Pub. Res. Code, §§30000–30900) (Coastal Act)[2]

---

[1] On our own motion, we take judicial notice of these geographical facts relating to Martins Beach. (Evid. Code § 452, subd. (h); *In re Nicole H.* (2016) 244 Cal.App.4th 1150, 1153; see also California Coastal Records Project <http://www.cacoast.org/6182> (as of Aug. 3, 2017).)

[2] All undesignated statutory references are to the Public Resources Code.

applied to the conduct of appellants, and they were required to apply for a coastal development permit (CDP) before closing public access. The court also issued an injunction that requires appellants to allow public coastal access at the same level that existed when appellants bought the Martins Beach property in 2008. We affirm the trial court's conclusion appellants' conduct is "development" requiring a CDP under section 30106 of the Coastal Act. Further, we conclude appellants' constitutional challenge to the Coastal Act's permitting requirement under the state and federal takings clauses is not ripe, and we reject appellants' contention that the trial court's injunction is a per se taking. Finally, we affirm the trial court's award of attorney fees to Surfrider.

BACKGROUND

Before appellants purchased Martins Beach, the public was permitted to access the coast by driving down Martins Beach Road and parking along the coast, usually upon payment of a fee. Public access was only permitted during the daytime, and access in the winter varied based on the weather.[3]

A table (10.1) attached to San Mateo County's 1998 Local Coastal Program policies manual indicates that, while Martins Beach is privately owned, there is public access to the water and a high level of existing use. Prior to appellants' purchase of the Martins Beach property, appellants were told by San Mateo County that "[t]here is existing parking [and] access to the beach at Martins Beach. This access [is] also

_____

[3] The parties dispute the nature and extent of public access to Martins Beach prior to 2008. Appellants contend the previous owners "operated a business of allowing permissive access to their property upon payment of a fee." They argue the access was entirely permissive, pointing to testimony that the previous owners would "just close it down for any period [they] felt like closing it." We need not summarize all the evidence on the history of access to the coast at Martins Beach, because whether the public acquired a right of access through the history of public use is not at issue in the present litigation. As explained later in this background summary, whether there has been a dedication of a public use right *is* at issue in separate ongoing litigation to which Surfrider is not a party. (See *Friends of Martin's Beach v. Martins Beach 1 LLC, et al.* (Super. Ct. San Mateo County, CIV517634).)

2

memorialized [and] required to be preserved (no exceptions) by the Local Coastal Program" and "the access is there & will have to remain."

Following the purchase of Martins Beach in July 2008, appellants continued to allow the public to access the coast upon payment of a parking fee. From July 2008 to September 2009, numerous vehicles paid the fee to access the coast.[4] Appellants stopped allowing public access in September 2009.[5] They closed the gate (requiring a remote control or key to open it), put a no-access sign on the gate, and painted over a billboard at the entrance to the property that had advertised access to the beach.

Prior to this complete closure, on February 6, 2009, the San Mateo County Planning and Building Department had sent appellants an "Informational Warning Letter" that, among other things, referenced observations that the gate allowing access to Martins Beach was closed and the billboard advertising access had been painted over. The County requested a schedule of operation and an explanation "of how the schedule relates to historic patterns of public use," to allow a determination of whether future beach closures "would trigger the need for a CDP." The County asserted that "any change in the public's ability to access the shoreline at Martins Beach triggers the need for a CDP because it represents a 'change in the intensity of use of water or access thereto.' " (See § 30106.) On February 9, appellants responded, informing the County they "voluntarily intended to maintain the same amount and type of access as did our predecessors." Appellants also stated the beach was usually closed in winter and they considered the public "invited guests."

_____

[4] According to the trial court's characterization of appellants' records, 1,044 vehicles paid the access fee during that period.

[5] In their discovery responses, appellants stated access was closed in the summer or fall of 2010. But at trial appellants' manager testified that logs recording payments of fees reflected the extent of access permitted to Martins Beach, and there is no access recorded in the logs after September 2009. In any event, the date when access was closed is not important for the purposes of the present appeal.

In April 2009, the County responded to appellants' February letter, again asserting appellants were required to apply for a CDP before changing the public's access to Martins Beach. Among other things, the County requested additional information regarding the history of public access, referencing publications stating the public previously had year-round access to Martins Beach. In May, appellants again informed the County they would "provide access to the extent it was provided by the" prior owners, but appellants asserted they were not legally obligated to do so. Appellants also offered to "provide [the County] with affidavits" to support their contentions about the circumstances under which access and use had historically existed.

In June 2009, appellants filed a lawsuit against San Mateo County (the County) and the California Coastal Commission (the Coastal Commission), seeking a declaration that, among other things, they were not required to maintain public access to Martins Beach. In October, the trial court in the case sustained the defendants' demurrers without leave to amend, concluding appellants were obligated to "comply with the administrative process provided by the" Coastal Act before seeking a judicial determination of their rights.

In September 2009, appellants stopped allowing the public access to the coast at Martins Beach. Appellants did not apply for a CDP allowing them to do so.

In September 2011, the Coastal Commission sent appellants a letter asserting, among other things, that "the erection of beach closure signs . . . as well as the permanent closure of an existing gate . . . [at Martins Beach] would constitute development under the Coastal Act" and San Mateo County's Local Coastal Plan. In November, San Mateo County sent appellants a letter entitled in part, "Notice of Preliminary Determination of Violation." The letter asserted appellants' "closure of the coastal access" at Martins Beach was unlawful because appellants did not obtain a CDP. In December, appellants responded, arguing the beach closure was not a violation of the Coastal Act. Appellants asserted, "the road on Martins Beach is not subject to any access easement or any

4

condition of any permit, but, rather, has historically been available to the public permissively at the voluntary election and sole discretion of the property owner." The parties do not refer to further enforcement efforts by the County or the Coastal Commission relating to closure of public access to Martins Beach.

In October 2012, an unincorporated association going by the name "Friends of Martin's Beach" filed a lawsuit against appellants seeking access to the coast at Martins Beach based on claims including a constitutional right of access or an express dedication of access. (*Friends of Martin's Beach v. Martins Beach 1, LLC, et al.* (Super. Ct. San Mateo County, CIV517634).) The trial court in that case entered summary judgment in favor of appellants, concluding Martins Beach is private property not subject to any right of public access. The plaintiff appealed, and Division 2 of this court reversed in part. (*Friends of Martin's Beach v. Martin's Beach 1 LLC* (Apr. 27, 2016, A142035) review den. and opn. ordered nonpub. July 20, 2016.) As relevant here, the court of appeal held the plaintiff had "alleged facts sufficient to state a common law dedication claim" and appellants had "not shown that as a matter of law they are entitled to judgment" on the claim. (*Id*. at p. 45.) The court of appeal remanded for trial on the dedication claim. (*Id*. at p. 51.) The *Friends of Martin's Beach* case is still pending in the trial court; accordingly, the existence of public access rights to Martins Beach is presently undetermined.

In March 2013, Surfrider filed the present action. The complaint alleged appellants engaged in "development" (§ 30106) within the meaning of the Coastal Act by closing public access to the coast at Martins Beach. The complaint alleged appellants closed the gate to Martins Beach Road, added a sign to the gate stating "BEACH CLOSED KEEP OUT," covered over another sign that had advertised public access, and stationed security guards to deny public access. The complaint sought a declaration that appellants' conduct constituted development under the Coastal Act requiring a CDP, injunctive relief, imposition of fines, and an award of attorney fees under Code of Civil

5

Procedure section 1021.5. Appellants filed a cross-complaint seeking a declaration that its conduct did not constitute development under the Coastal Act and an injunction prohibiting trespassing.

Trial began in May 2014, and the trial court received testimony and documentary evidence over the course of six court days.[6] In November, the trial court issued a Final Statement of Decision holding that appellants had, without a CDP, engaged in "development" within the meaning of the Coastal Act by stopping the public's use of and access to Martins Beach.[7]

In December 2014, the trial court entered judgment in favor of Surfrider on its claims for declaratory and injunctive relief. The court declared, "[Appellants'] desire to change the public's access to and use of the water, beach and coast at Martins Beach constitutes development under the [Coastal Act]. [Citation.] Consequently, if [appellants] wish to change the public's access to and use of the water, beach and/or coast at Martins Beach, they are required to obtain a [CDP] prior to doing so." The court also declared, "[Appellants'] conduct in changing the public's access to and use of the water, beach and coast at Martins Beach, specifically by permanently closing and locking a gate to the public across Martins Beach Road, adding signs to the gate, changing the messages on the billboard on the property and hiring security guards to deter the public from

---

[6] Also in 2014, Senate Bill 968 was signed into law and codified at section 6213.5. (Stats. 2014, ch. 922, § 1.) That statute authorizes the State Lands Commission to negotiate with appellants "to acquire a right-of-way or easement . . . for the creation of a public access route to and along the shoreline . . . at Martins Beach" and, if necessary, "to acquire a right-of-way or easement, pursuant to Section 6210.9, for the creation of a public access route to and along the shoreline, including the sandy beach, at Martins Beach. . . ." (§ 6213.5, subds. (a)(1) & (b).) The parties cite to nothing in the record indicating that any such negotiations have occurred or that any such proceeding has been initiated.

[7] The trial court declined to impose fines on appellants, and the court rejected the claims in appellants' cross-complaint. Those claims are not at issue in the present appeal.

6

crossing or using the Property to access the water, beach and coast at Martins Beach without a [CDP] constitutes a violation of the [] Coastal Act."

The judgment also provided the following injunctive relief: "[Appellants] are hereby ordered to cease preventing the public from accessing and using the water, beach and coast at Martins Beach until resolution of [appellants'] [CDP] application has been reached by San Mateo County and/or the Coastal Commission. The gate across Martins Beach Road must be unlocked and open to the same extent that it was unlocked and open at the time [appellants] purchased the property."

In December 2014, Surfrider filed a motion for attorney fees pursuant to section 1021.5 of the Code of Civil Procedure. Surfrider requested fees in the amount of $609,176.93 and costs in the amount of $15,511.01. That request included a voluntary reduction of over 25% from the lodestar total based on counsel's actual hours. In May 2015, the trial court granted the motion and awarded Surfrider $470,461.55 in attorney fees and $15,511 in costs.

Appellants appealed from both the judgment and the order granting attorney fees. Amici curiae briefs in support of Surfrider were filed by the Coastal Commission (joined by the County) and Coastwalk California; an amici curiae brief in support of appellants was filed by the Pacific Legal Foundation, on its own behalf and on behalf of a number of business associations interested in the regulation of California coastal development.[8]

---

[8] This court previously deferred ruling on Surfrider's March 30, 2016 request for judicial notice of a January 2016 letter from the Coastal Commission to the chief of the Palos Verdes Estates Police Department regarding the interpretation of "development" as used in the Coastal Act. Because consideration of the letter is unnecessary to resolution of the issues on appeal, the request for judicial notice is denied.

7

DISCUSSION

I.    *Appellants' Conduct is "Development" Under the Coastal Act*

Appellants contend the trial court erred in concluding that their conduct in closing public access to Martins Beach constituted "development" requiring a CDP under section 30106 of the Coastal Act. Appellants' claim fails.[9]

A.    *The Coastal Act*

"The Coastal Act of 1976 ( . . . § 30000 et seq.) was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The Legislature found that 'the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people'; that 'the permanent protection of the state's natural and scenic resources is a paramount concern'; that 'it is necessary to protect the ecological balance of the coastal zone' and that 'existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state . . . .' (§ 30001, subds. (a) and (d)). '[T]he basic goals of the state for the coastal zone' are to: '(a) Protect, maintain, and, where

---

[9] We reject the contention of amicus the Coastal Commission that appellants were required to exhaust their administrative remedies under *Coachella Valley Mosquito & Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072 (*Coachella Valley*), before presenting this claim. As in *Coachella Valley*, the issue in the present case is of "significant public interest," it is "purely legal and of a kind within the [court's] expertise," and "we have received the benefit of the [Coastal Commission's] views . . . through its [amicus brief] in this court." (*Id.* at p. 1083.)

Appellants also argue the public cannot be given access rights under the Coastal Act because title to the Martins Beach property is derived from a Mexican land grant confirmed by a federal patent issued in the 19th century. That claim is a challenge to the Coastal Commission's jurisdiction as to which appellants must exhaust their administrative remedies by applying for a CDP. (*Coachella Valley, supra*, 35 Cal.4th at pp. 1082–1083.) Among other things, and in contrast to appellants' claim regarding the meaning of the term "development," we have not received the benefit of the Coastal Commission's views regarding this contention, which has potentially broad implications for the operation of the Coastal Act.

8

feasible, enhance and restore the overall quality of the coastal zone environment and its natural and manmade resources. [¶] (b) Assure orderly, balanced utilization and conservation of coastal zone resources taking into account the social and economic needs of the people of the state. [¶] (c) Maximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of property owners. [¶] (d) Assure priority for coastal-dependent and coastal-related development over other development on the coast. [¶] [and] (e) Encourage state and local initiatives and cooperation in preparing procedures to implement coordinated planning and development for mutually beneficial uses, including educational uses, in the coastal zone.' (§ 30001.5.)" (*Yost v. Thomas* (1984) 36 Cal.3d 561, 565–566 (fn. omitted); see also *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2007) 55 Cal.4th 783, 793–794 (*Pacific Palisades*).) The Coastal Act "shall be liberally construed to accomplish its purposes and objectives." (§ 30009; accord *Pacific Palisades*, at pp. 793–794.)

Under the Coastal Act, with the exception of certain emergency work, any person "wishing to perform or undertake any development in the coastal zone . . . shall obtain a coastal development permit," in addition to any other permits required by law. (§ 30600, subd. (a).)[10] Section 30106 provides that " 'Development' means, on land, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or

---

[10] The Coastal Act "requires local governments to develop local coastal programs, comprised of a land use plan and a set of implementing ordinances designed to promote the act's objectives of protecting the coastline and its resources and of maximizing public access. [Citations.] Once the Coastal Commission certifies a local government's program, and all implementing actions become effective, the commission delegates authority over coastal development permits to the local government." (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 794.) San Mateo County has a certified Local Coastal Program.

9

intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act . . . , and any other division of land, . . . ; *change in the intensity of use of water, or of access thereto*; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility; and the removal or harvesting of major vegetation other than for agricultural purposes, kelp harvesting, and timber operations which are in accordance with a timber harvesting plan . . . ." (Emphasis added.) The Coastal Act also contains procedures for waiver of the permit requirement and categorical exclusions from the requirement. (§§ 30108.6, 30610.)

The Coastal Act also includes findings about the importance of public participation. Section 30006 provides, "The Legislature further finds and declares that the public has a right to fully participate in decisions affecting coastal planning, conservation and development; that achievement of sound coastal conservation and development is dependent upon public understanding and support; and that the continuing planning and implementation of programs for coastal conservation and development should include the widest opportunity for public participation."

B.    *Statutory Interpretation Principles*

" 'As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] We begin by examining the statutory language because the words of a statute are generally the most reliable indicator of legislative intent. [Citations.] We give the words of the statute their ordinary and usual meaning and view them in their statutory context. [Citation.] We harmonize the various parts of the enactment by considering them in the context of the statutory framework as a whole. [Citations.] 'If the statute's text evinces an unmistakable plain meaning, we need go no further.' [Citation.] 'Only when the statute's language is ambiguous or susceptible of more than one reasonable interpretation, may the court turn to extrinsic aids to assist in interpretation.' " (*In re C.H.* (2011) 53

10

Cal.4th 94, 100–101.) "When a provision of the Coastal Act is at issue, we are enjoined to construe it liberally to accomplish its purposes and objectives, giving the highest priority to environmental considerations." (*McAllister v. California Coastal Com.* (2008) 169 Cal.App.4th 912, 928.)

      C.     *The Plain Language of the Coastal Act Controls*

The trial court held appellants' conduct in closing public access to Martins Beach was "development" under the Coastal Act because it decreased access to the water. (§ 30106 ["development" includes "change in the intensity of use of water, or of access thereto"].) Appellants argue, "the simple acts of closing a gate and painting a sign do not constitute 'development' that requires a permit. It is commonsense that these acts are nothing like those specifically covered by the statute—such as constructing or demolishing a building, dredging or mining the land, or subdividing parcels." Similarly, they assert, "What the actions included in Section 30106's definition have in common is that they significantly change the nature of the land or a structure built on the land in question."

The Coastal Act has not been read as narrowly as appellants propose. Instead, the courts have given the term "development" an "expansive interpretation . . . consistent with the mandate that the Coastal Act is to be 'liberally construed to accomplish its purposes and objectives.' [§ 30009]." (*Pacific Palisades*, *supra*, 55 Cal.4th at p. 796; see also *Gualala Festivals Committee v. California Coastal Com.* (2010) 183 Cal.App.4th 60, 67 (*Gualala*) ["the statute provides an expansive definition of the activities that constitute development for purposes of the Act. It is the language of that definition that must be applied and interpreted, giving the words their usual and ordinary meaning."].) Thus, directly contrary to appellants' assertions, "the Coastal Act's definition of 'development' goes beyond 'what is commonly regarded as a development of real property' [citation] and is not restricted to activities that physically alter the land or water [citation]." (*Pacific Palisades*, at p. 796; see also *Gualala*, at p. 67 [fireworks

display is development under plain language of section 30106, even though not "commonly regarded" as such]; *Surfrider Foundation v. California Coastal Com.* (1994) 26 Cal.App.4th 151, 158 ["the public access and recreational policies of the Coastal Act should be broadly construed to encompass all impediments to access, whether direct or indirect, physical or nonphysical"].) What is important for purposes of section 30106 in the present case is that appellants' conduct indisputably resulted in a significant *decrease* in access to Martins Beach. *Pacific Palisades* specifically contemplated that such a change would be within the scope of the Coastal Act permitting requirement. (*Pacific Palisades*, at p. 795 ["section 30106, by using the word 'change,' signals that a project that would decrease intensity of use, such as by limiting public access to the coastline or reducing the number of lots available for residential purposes, is also a development"].) Accordingly, the nature of the conduct at issue does not undermine the conclusion that it is development under the plain language of section 30106.[11]

Appellants also contend the trial court erred in interpreting the Coastal Act because it "failed to differentiate between true 'public access' – the right of the public to freely traverse open lands – and 'permissive access' – where a private owner allows invitees to enter and use his or her lands." They suggest development under the Act should be read to encompass activities that result in a change in the intensity of access to water only where the access is pursuant to an *established public right of access*. They argue the contested language in section 30106 "was simply intended to require a property owner to obtain a permit if it wants to make changes that will impact a preexisting right of public use or access—i.e., limiting access to a public easement that has been granted,

---

[11] Appellants also argue their conduct does not constitute development because the gate and sign allegedly predate the Coastal Act, the act does not regulate the content of signs, and the gate and fence are authorized because they are in an agricultural zone. Appellants' arguments are misplaced. It is the totality of appellants' conduct in closing access to Martins Beach that the court concluded fell within the definition of development.

purchased, or otherwise acquired as matter of legal right—not when a property owner simply wants to limits the extent to which it will invite the public to use its concededly private property." Essentially, they argue section 30106 should be applied as if it read, "development" includes "change in the intensity of use of water, or of *established public right of* access thereto."

However, appellants point to nothing in the Coastal Act that would permit this court to add the limiting descriptive phrase "established public right of" to section 30106. (*People v. Massicot* (2002) 97 Cal.App.4th 920, 925 ["In construing a statute, it is the role of the judiciary to simply ascertain and declare what is in terms or in substance contained in the statute, not to insert what has been omitted."]; see also *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 (*California Federal*).) Appellants focus on section 30211, in Article 2 of Chapter 3 of the act (entitled "Public Access"), which provides in part, "Development shall not interfere with the public's right of access to the sea where acquired through use or legislative authorization. . . ." But that provision does not purport to modify the definition of development in section 30106.[12]

Next, appellants emphasize language in the Coastal Act providing assurances regarding the protection of private property rights. For example, section 30010 states, "The Legislature hereby finds and declares that this division is not intended, and shall not be construed as authorizing the commission, port governing body, or local government acting pursuant to this division to exercise their power to grant or deny a permit in a manner which will take or damage private property for public use, without the payment of just compensation therefor. This section is not intended to increase or decrease the rights of any owner of property under the Constitution of the State of California or the

---

[12] We need not decide for purposes of the present appeal whether section 30211 contemplates that findings about acquisition of use rights may be made in proceedings on a CDP.

United States." However, that provision merely re-states the limitations imposed by the takings clauses. Nothing in that language or other provisions referenced by appellants provides any basis to adopt the narrowing interpretation they propose. Instead, one of the "basic goals of the state for the coastal zone" is to "*Maximize* public access to and along the coast and *maximize* public recreational opportunities in the coastal zone consistent with sound resources conservation principles and constitutionally protected rights of private property owners." (§ 30001.5, subd. (c), emphasis added.) Thus, maximizing access is the goal, with the constitutional rights of property owners as the outside limit on access. The Legislature's determination to define "development" broadly and require consideration of property rights during the permitting process is sensible because it allows for public participation and the development of a full record regarding the nature and extent of the private and public property rights at stake.

Finally, appellants contend an interpretation of the Coastal Act permitting requirement that encompasses their conduct "would lead to all manner of absurd results. Must a private owner seek a permit anytime he wishes to throw a party with guests, and then again before he asks his guests to leave? Must a private owner who has a permit to install a water pump seek a permit every time he wishes to turn the pump on or off? Is a permit necessary to have a garage sale at one's home situated on the Coast?" However, the Coastal Act recognizes and addresses the possibility that the broad definition of development could be applied in situations where it would be inappropriate to require a CDP. Thus, section 30610 (entitled "Developments authorized without permit") provides that no permit shall be required with respect to a number of specific listed activities; with respect to "temporary event[s]" that do "not have any significant adverse impact upon coastal resources" (§ 30610, subd. (i)(1)); and with respect to "[a]ny category of development, or any category of development within a specifically defined geographic area, that the commission . . . has described or identified and with respect to which the commission has found that there is no potential for any significant adverse effect, either

14

individually or cumulatively, on coastal resources or on public access to, or along, the coast . . . ." (§ 30610, subd. (e); see also Cal. Code Regs., tit. 14, Div. 5.5, Ch. 6 ["Exclusions from Permit Requirements"].)  Further, section 30624.7 authorizes the Coastal Commission to establish procedures for the executive director to issue "waivers from [CDP] requirements for any development that is de minimis" and defines "de minimis" as a development that "involves no potential for any adverse effect, either individually or cumulatively, on coastal resources . . . ."  (See also *Pacific Palisades*, *supra*, 55 Cal.4th at p. 797 [noting that, through section 30624.7, the Coastal Act "accounts for the possibility a proposed project may not affect coastal resources"]; *Gualala*, *supra*, 183 Cal.App.4th at p. 69 [citing section 30624.7 and stating "[t]hus, temporary or de minimis activity that does not adversely impact coastal resources is characterized in the statute as 'development' but may be exempted from the permit requirement"].)

That the Legislature adopted exceptions from the permitting requirement and authorized further exemptions for conduct that would literally constitute "development" under section 30106 shows the broad definition was meant to be taken literally and the possibility that it would be absurd to require a CDP for certain conduct would be addressed through the procedures for exceptions in the Coastal Act.  Appellants fail to show that the exceptions procedures are inadequate.  The *Gualala* court rejected an argument directly analogous to that made by appellants.  There, the appellant argued construing development broadly enough to encompass its fireworks festival would lead to " 'absurd results,' " outlining various scenarios, as appellants do in the present case. (*Gualala*, *supra*, 183 Cal.App.4th at p. 69, fn. 3.)  *Gualala* rejected the argument, stating "The exemption and waiver provisions, however, avoid [appellant's] hypothetical absurdities."  (*Ibid.*)  The court further explained, "Construing the Act to provide the [Coastal] Commission with both expansive jurisdiction to control even limited, temporary development and the authority to exempt from the permit process development

15

that does not have 'any significant adverse impact upon coastal resources' provides the [Coastal] Commission the necessary flexibility to manage the coastal zone environment so as to accomplish the statutory purposes." (*Id.* at pp. 69–70; accord *Pacific Palisades*, *supra*, 55 Cal.4th at p. 797.) The same reasoning applies here.[13]

Liberally construing the Coastal Act to accomplish its purposes and objectives (§ 30009), we conclude the trial court did not err in applying the plain language of section 30106.[14]

_____

[13] Arguably, interpreting section 30106 to encompass appellants' conduct would trigger the section 30212 requirement that "new development projects" provide public coastal access. (See *Whaler's Village Club v. California Coastal Com.* (1985) 173 Cal.App.3d 240, 258.) However, if the permit consideration process disclosed no basis to deny appellants a CDP allowing them to close public access to Martins Beach, it would likely be improper to impose that access requirement. Among other things, section 30214, subdivision (b), requires that "the public access policies of this article be carried out in a reasonable manner that considers the equities and that balances the rights of the individual property owner with the public's constitutional right of access."

[14] Because the plain language of section 30106 controls, it is unnecessary to address appellants' arguments based on the legislative history of the Coastal Act. (*People v. Flores* (2003) 30 Cal.4th 1059, 1063 ["When the language of a statute is clear, we need go no further."]; *California Federal, supra,* 11 Cal.4th at p. 349 ["When, as here, ' " 'statutory language is . . . clear and unambiguous there is no need for construction, and courts should not indulge in it.' " ' "].) In any event, none of appellants' arguments provide a persuasive basis to reject a plain language interpretation of section 30106. Appellants also point to section 6213.5, which directs the Coastal Commission to negotiate with appellants to obtain an easement or to acquire an easement by eminent domain. (See fn. 6, *ante*.) However, appellants do not explain how the enactment of section 6213.5 is relevant to our construction of "development" in the Coastal Act. Section 6213.5 reflects the Legislature's intent that public access to Martins Beach be preserved, but it does not affect our analysis. Appellants urge that their proposed interpretation of "development" avoids the difficult constitutional questions addressed in part III, *post,* of this decision. (See, e.g., *People v. Engram* (2010) 50 Cal.4th 1131, 1161 ["a statute must be construed, if reasonably possible, in a manner that avoids a serious constitutional question"].) However, appellants cite no authority such consideration provides a basis for disregarding the plain statutory language.

Finally, we reject appellants' suggestion in a July 10, 2017 letter submitted following oral argument that the California Supreme Court's recent decision in *Lynch v. California Coastal Com.* (2017) 3 Cal.5th 470, is relevant to the present appeal. Appellants assert that *Lynch* "underscores that if [appellants] were to apply for a permit

16

II.     *Appellants' Challenge to the Coastal Act's Permit Requirement is Not Ripe*

Appellants contend interpreting the Coastal Act to require they apply for a CDP would constitute an unconstitutional taking under the state and federal Constitutions. Surfrider and amicus the Coastal Commission argue that claim is not ripe for review. We agree.

A takings claim that challenges the application of regulations to particular property is not ripe until "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." (*Williamson Co. Regional Planning v. Hamilton Bank* (1985) 473 U.S. 172, 186; accord *Landgate, Inc. v. California Coastal Com.* (1998) 17 Cal.4th 1006, 1018 (*Landgate*); see also *MacDonald, Sommer & Frates v. Yolo County* (1986) 477 U.S. 340, 348 ["an essential prerequisite . . . is a final and authoritative determination of the type and intensity of development legally permitted on the subject property"]; *Hensler v. City of Glendale* (1994) 8 Cal.4th 1, 12 ["The impact of a law or regulation on the owner's right to use or develop the property cannot be assessed until an administrative agency applies the ordinance or regulation to the property and a final administrative decision has been reached with regard to the availability of a variance or other means by which to exempt the property from the challenged restriction."]; *Boise Cascade Corp. v. United States* (Fed.Cir. 2002) 296 F.3d 1339, 1351–1352 (*Boise Cascade*) [collecting cases].)  Such a final decision "informs the constitutional determination whether a regulation has deprived a landowner of 'all economically beneficial use' of the property, [citation], or defeated the reasonable investment-backed expectations of the landowner to

---

to engage in 'development,' even while protesting the jurisdiction of the Coastal Commission over its conduct, [respondents] could try to argue that [appellants'] applying for and/or receiving some form of permit forfeited all challenges to the Coastal Commission's jurisdiction."  Regardless of the applicability of *Lynch*'s forfeiture analysis to that situation, we have concluded appellants' conduct is "development" within the meaning of the Coastal Act.

17

the extent that a taking has occurred, [citation]. These matters cannot be resolved in definitive terms until a court knows 'the extent of permitted development' on the land in question." (*Palazzolo v. Rhode Island* (2001) 533 U.S. 606, 618; see also *Williamson*, at p. 191.)

Appellants' takings claim with respect to the Coastal Act permit requirement is necessarily distinct from its claim with respect to the trial court's injunction (see part III, *post*). The injunction was a final determination that actually required appellants to temporarily allow the public to access Martins Beach. In contrast, it is undisputed that appellants have not obtained a final decision on an application for a CDP allowing them to close public access to Martins Beach; indeed, the record does not indicate any such application has been submitted. As amicus the Coastal Commission points out, "If the Coastal Act agencies grant [appellants] a permit to close their property to the public, or accept that denial of a permit would violate the provisions of [] section 30010 and adjust application of Coastal Act policies accordingly, or find that the public has existing rights of access to the property, those decisions would certainly inform determinations regarding the economic impact on [appellants] of Coastal Act regulation of their property as well as determinations regarding the character of the government action." Accordingly, appellants' claim the permit requirement itself effects a taking is not ripe. (See *Landgate, supra*, 17 Cal.4th at pp. 1017–1018, quoting *United States v. Riverside Bayview Homes, Inc.* (1985) 474 U.S. 121, 126–127 [" '[T]he mere assertion of regulatory jurisdiction by a governmental body does not constitute a regulatory taking. . . . A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired.' "].)

Appellants contend the ripeness requirement does not apply to them as the defendants, asserting that "ripeness is a prohibition on *plaintiffs* raising claims that do not

18

yet warrant judicial attention." However, appellants' cases do not support that broad proposition; appellants' takings claim regarding the permit requirement cannot be resolved for the reasons explained above, even though the claim is asserted as a defense to Surfrider's effort to enforce the permitting requirements of the Coastal Act. (See *Vandermost v. Bowen* (2012) 53 Cal.4th 421, 452 (*Vandermost*) [" 'the ripeness doctrine is primarily bottomed on the recognition that judicial decisionmaking is best conducted in the context of an actual set of facts so that the issues will be framed with sufficient definiteness to enable the court to make a decree finally disposing of the controversy.' "].)[15] Appellants also argue their challenge to the permit requirement is ripe because "neither the County nor the [Coastal] Commission could deny a request for a permit to exercise [the right to exclude] without violating the Takings Clause." It may be that appellants' CDP application will be granted because the reviewing authority concludes denial of a permit would violate appellants' property rights, contrary to section 30010 of the Coastal Act. That determination will depend on the record developed following a CDP application. But appellants present no authority for the proposition that the likelihood their permit will be granted affects this court's analysis of the ripeness of their claim. Finally, we reject appellants' apparent suggestion, also unsupported by authority, that ripeness is only at issue in regulatory takings claims. Appellants' claim is

---

[15] *Horne v. Department of Agriculture* (2015) 135 S.Ct. 2419, does not support appellants' claim. There, the Supreme Court held raisin growers could present a takings defense in an enforcement action after they refused to surrender a quantity of raisins to the federal government pursuant to a regulation intended to stabilize prices. (*Id.* at p. 2056.) The court concluded the claim was ripe because it was not a situation where "the plaintiff 'ha[d] not yet obtained a final decision regarding the application of the . . . regulations to its property.' " (*Id.* at p. 2061.) Instead, "petitioners were subject to a final agency order imposing concrete fines and penalties at the time they sought judicial review." (*Id.* at pp. 2061–2062.) There is no comparable final order in the present case.

not ripe because the bare permit requirement is not a taking; that the outcome they oppose is allegedly a physical taking does not change the analysis.[16]

This court will not issue an "advisory opinion" (*Vandermost*, *supra*, 53 Cal.4th at p. 452) regarding the constitutionality of a hypothetical decision on a CDP application regarding closure of Martins Beach before the County or Coastal Commission is given an opportunity to render a decision.

III.    *Appellants Have Not Shown the Trial Court's Injunction Is Unconstitutional*

The trial court's judgment provides the following injunctive relief: "Defendants are hereby ordered to cease preventing the public from accessing and using the water, beach, and coast at Martins Beach until resolution of Defendants' [CDP] application has been reached by San Mateo County and/or the Coastal Commission.  The gate across Martins Beach Road must be unlocked and open to the same extent that it was unlocked and open at the time Defendants purchased the property."  Appellants contend the injunction effects a per se physical taking.  As we explain below, the United States Supreme Court is divided on the question of whether a judicial action may, itself constitute a taking.  (See *Petro-Hunt, L.L.C. v. United States* (Fed.Cl. 2016) 126 Fed.Cl. 367, 378 (*Petro-Hunt*) ["The contours—and even the existence—of a judicial takings doctrine has been debated in federal courts and in legal scholarship."]; *Brace v. United States* (Fed.Cl. 2006) 72 Fed.Cl. 337, 358–359 ["Generally speaking, court orders have never been viewed themselves as independently giving rise to a taking."].)  What is clear, however, is that judicial action that would be a taking if it were a legislative or executive act is unconstitutional, under either the takings clause or the due process clause.  Pending a judicial ruling to the contrary, it is also clear that the trial court's injunction intrudes on

---

[16] We recognize that the permit requirement means appellants are legally required to obtain a permit before closing public access, but appellants have not demonstrated that affects the ripeness analysis.  The Coastal Commission has not sought to impose penalties for appellants' failure to seek a permit and we need not consider to what extent such penalties can be imposed on appellants, consistent with the takings clause.

appellants' established property right to exclude others by allowing the public to access Martins Beach pending a determination on appellants' application for a CDP. However, we reject appellants' contention that this temporary right of beach access is a per se taking. Because appellants do not contend the injunction is a taking under the ad hoc, multifactor test of *Penn Central Transp. Co. v. City of New York* (1978) 438 U.S. 104 (*Penn Central*), or under any other multifactor analysis, we do not evaluate the trial court's injunction under such an analysis.

A.  *If Appellants Established that the Trial Court's Injunction Effected a Taking, It Was Unconstitutional*[17]

"The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment [citation], provides that private property shall not 'be taken for public use, without just compensation.' " (*Lingle v. Chevron U.S.A. Inc.* (2005) 544 U.S. 528, 536 (*Lingle*); see also Cal. Const., art. I, § 19 [takings clause in California constitution]; *California Building Industry Assn. v. City of San Jose* (2015) 61 Cal.4th 435, 456, fn. 10 (*California Building Industry. Assn.*) ["In contexts comparable to that at issue in this case, past cases of this court have interpreted the state takings clause 'congruently' with the federal takings clause."].)[18] "As a general matter, so long as a land use regulation does not constitute a physical taking or deprive a property owner of all viable economic use of the property, such a restriction does not violate the takings clause insofar as it governs a property owner's future use of his or her property, except in the unusual circumstance in which the use restriction is properly found to go 'too far' and to constitute a 'regulatory taking' under the ad hoc, multifactored test discussed by the

---

[17] At various points in this decision we phrase the question at issue as whether the trial court's injunction effected a "taking." But, consistent with our discussion herein, we mean that it would be considered a taking if done by the legislative or executive branches of government.

[18] There are significant differences between the state and federal takings clauses with respect to the timing of and procedures for just compensation. (See *Property Reserve, Inc. v. Superior Court* (2016) 1 Cal.5th 151, 185–188 (*Property Reserve*).)

United States Supreme Court in *Penn Central*[, *supra*, 438 U.S. 104]." (*California Building. Industry Assn.*, at p. 462.) Governmental action that constitutes a permanent physical invasion or deprives a property of all viable economic use is usually a " 'categorical' " taking requiring compensation. (*Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th at p. 774 (*Kavanau*).) The determination of whether a taking has occurred is "a question of law based on factual underpinnings." (*Bass Enterprises Prod. Co. v. United States* (Fed.Cir. 1998) 133 F.3d 893, 895.)

In *Stop the Beach Renourishment, Inc. v. Florida D.E.P.* (2010) 560 U.S. 702 (*Stop the Beach*), the United States Supreme Court considered the applicability of the takings clause to judicial action. There, a group of beachfront landowners contended the Florida Supreme Court took their property when it held that a state statute providing for beach restoration projects did not unconstitutionally deprive landowners of their right to littoral accretions (additions of sand, sediment, or other deposits to waterfront land). (*Stop the Beach*, at pp. 707–712.) The eight justices who took part in the case[19] held the Florida court's decision did not constitute a violation of the takings clause because it "did not contravene the established property rights of" the landowners. (*Id.* at p. 733.) The court reasoned, "[t]here is no taking unless petitioner can show that, before the Florida Supreme Court's decision, littoral-property owners had rights to future accretions and contact with the water superior to the State's right to fill in its submerged land." (*Id.* at p. 730.) The landowners failed to make that showing. (*Id.* at pp. 730–733.)[20]

---

[19] Justice Stevens did not participate in deciding the case. (*Stop the Beach*, *supra*, 560 U.S. at p. 733.)

[20] The Florida statute designated the re-claimed beach as public property. (*Stop the Beach*, *supra*, 560 U.S. at p. 710.) The Florida Supreme Court concluded the legislation was not a taking because the doctrine of "avulsion . . . permitted the State to reclaim the restored beach on behalf of the public." (*Id.* at p. 712.) Justice Scalia's plurality opinion framed the relevant question under the takings clause as whether the Florida Supreme Court's interpretation of the relevant property law had "declare[d] that what was once an established right of private property no longer exists." (*Id.* at p. 715; see also Peñalver & Strahilevitz, *Judicial Takings or Due Process?* (2012) 97 Cornell L.Rev. 305, 365 ["If

As relevant to the present case, in resolving *Stop the Beach*, the Justices considered whether a court decision can effect a compensable taking of property. Justice Scalia's plurality opinion for four Justices concluded a state court decision could effect a compensable taking if it reversed well-established property law. The plurality reasoned the takings clause "bars *the State* from taking private property without paying for it, no matter which branch is the instrument of the taking." (*Stop the Beach*, *supra*, 560 U.S. at p. 715.) "If a legislature or a court declares that what was once an established right of private property no longer exists, it has taken that property, no less than if the State had physically appropriated it or destroyed its value by regulation." (*Ibid.*) But state court decisions that "merely clarify and elaborate property entitlements" are not judicial takings. (*Id.* at p. 727.) A state court decision that effects a taking should be reversed and the state legislature can decide to "either provide compensation or acquiesce in the invalidity of the offending features of the Act." (*Id.* at pp. 723–724.)

On the other hand, four other Justices declined to reach that issue, concluding it was unnecessary to determine whether the actions of a court can effect a taking. (*Stop the Beach*, *supra*, 560 U.S. at pp. 733–734 (conc. opn. of Kennedy, J.) ["[T]his case does not require the Court to determine whether, or when, a judicial decision determining the rights of property owners can violate the Takings Clause"]; *id.*, at p. 745 (conc. opn. of Breyer, J.) ["There is no need now to decide more than . . . that the Florida Supreme Court's decision in this case did not amount to a 'judicial taking.' "].) Justice Kennedy, joined by Justice Sotomayor, reasoned that exercise of the power to take property for public use (upon payment of compensation) has "as a matter of custom and practice" been within the province of "the political branches—the legislature and the executive—

the Florida Supreme Court had in fact changed its law of avulsion . . . [t]he [Florida] courts would have been the instrumentality by which the government defendants . . . . took private property for public use, literally redefining private property as state property."].)

not the courts." (*Stop the Beach*, at p. 735 (conc. opn. of Kennedy, J.).)  He expressed concern that a judicial takings doctrine would permit judges to exercise powers more appropriately resting in the legislative and executive branches and that there are unresolved questions as to, for example, the proper remedy for a judicial taking.  (*Id.*, at pp. 736-741.)  Justice Breyer, in his concurrence joined by Justice Ginsburg, warned that adoption of a judicial takings doctrine "would invite a host of federal takings claims without the mature consideration of potential procedural or substantive legal principles that might limit federal interference in matters that are primarily the subject of state law." (*Stop the Beach*, at p. 743 (conc. opn. of Breyer, J.).)

Justice Kennedy argued in his concurrence that the Due Process Clause was the more appropriate place to look for limitations on judicial power.  "The due process clauses of the state and federal Constitutions guarantee property owners 'due process of law' " prior to any deprivation of " 'property.' " (*Kavanau*, *supra*, 16 Cal.4th at p. 770; see also Cal. Const., art. I, § 7; U.S. Const., 14th Amend., § 1.)  The due process clauses "guarantee appropriate procedural protections [citation] and also place some substantive limitations on legislative measures." (*Kavanau*, at p. 771.)  Justice Kennedy reasoned that, "[i]f a judicial decision, as opposed to an act of the executive or the legislature, eliminates an established property right, the judgment could be set aside as a deprivation of property without due process of law.  The Due Process Clause, in both its substantive and procedural aspects, is a central limitation upon the exercise of judicial power." (*Stop the Beach*, *supra*, 560 U.S. at p. 735 (con. opn. of Kennedy, J.); see also *id.* at p. 737 ["The Court would be on strong footing in ruling that a judicial decision that eliminates or substantially changes established property rights, which are a legitimate expectation of the owner, is 'arbitrary or irrational' under the Due Process Clause."].)  Without opining whether the act would be a violation of procedural or substantive due process, Justice Kennedy declared that "without a judicial takings doctrine, the Due Process Clause

24

would likely prevent a State from doing 'by judicial decree what the Takings Clause forbids it to do by legislative fiat.' " (*Ibid*.)

Thus, under the plurality's views and under Justice Kennedy's concurrence, a judicial act that would constitute a taking if done by another branch of government is unconstitutional.[21] We recognize the claimed judicial taking in the present case is somewhat different from the one challenged in *Stop the Beach*. In that case, the claimed taking was an interpretation of property law that the landowners contended deprived them of their right to littoral accretions. (*Stop the Beach*, *supra*, 560 U.S. at pp. 707–712.) In the present case, the claimed taking is not an interpretation of property law. It is an injunction designed to enforce the permit requirements of the Coastal Act. Nevertheless, Surfrider does not contend that distinction affects the constitutionality of the injunction under *Stop the Beach*. Surfrider states that it "has no quarrel with the general proposition

---

[21] *Stop the Beach* does not seem the best case to serve as a foundation for an analysis of a judicial takings doctrine. The taking discussed by the plurality opinion originated in legislative action. Arguably, the judicial decision effectuated nothing more than a legislative taking and could have been analyzed as such. (See Stevens, J. (Ret.), *The Ninth Vote in the "Stop the Beach" Case* (2013) 88 Chi.-Kent L.Rev. 553, 557 ["if there had been any taking in the case, it would not have been a 'judicial' taking. Any taking that might have occurred was effected either when the Florida state legislature passed the statute authorizing the creation of new permanent unchanging property lines to replace the ever-changing common-law lines, or when the agency actually set the property lines that would preclude petitioners from acquiring further land by accretion."]; Snyder, *Unnecessary Expansion of the Takings Clause to the Judiciary: Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 130 S. Ct. 2592 (2010)* (2011) 30 Temp. J. Sci. Tech. & Envtl. L. 347, 369 ["In light of the fact that the Florida Supreme Court simply interpreted a legislative act, the case should have been brought on appeal as a traditional legislative taking claim."]; Policicchio, *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection* (2011) 35 Harv. Envtl. L.Rev. 541, 552 ["Instead of a state legislature's statutory enactment or a state executive's action constituting a taking, now the state court will have performed the taking through its review and interpretation of the statute or executive action."]; see also *Stop the Beach*, *supra*, 560 U.S. at p. 729, fn. 11 [rejecting legislative takings claim on same basis as judicial takings claim]; *Petro-Hunt, supra*, 126 Fed.Cl. at pp. 379–380 [reviewing cases but identifying none that applied *Stop the Beach* to find an unconstitutional judicial taking].)

that under certain circumstances, an injunction can constitute a taking of private property (whether characterized as a 'judicial taking' or deprivation of due process)." The lesson we take from *Stop the Beach* is that where it has been determined that a court action eliminates an established property right and would be considered a taking if done by the legislative or executive branches of government, it must be invalidated as unconstitutional, whether under the takings or due process clauses.[22] It is to that issue that we now turn.

B.    *The Trial Court's Injunction Temporarily Intrudes on Appellants' Established Right to Exclude Others*

At the outset, we reject Surfrider's suggestion that appellants' takings claim can be rejected simply because the injunction "only restores the historical status quo of public access, until and unless Appellants seek and obtain a CDP allowing them to end that use. It is no different than a court order enjoining a property owner from developing property without first applying for the permits required by law." We recognize, of course, that Surfrider *contends* the public has a right to access Martins Beach due to a dedication, which is an issue that will be determined in the separate *Friends of Martin's Beach* case (Super Ct. San Mateo County, CIV517634). However, Surfrider points to nothing

---

[22] Some California decisions have applied the takings clause to injunctions. For example, in *Cox Cable San Diego, Inc. v. Bookspan* (1987) 195 Cal.App.3d 22, 25, the court of appeal held the trial court properly denied a cable company's request for a preliminary injunction enjoining a property owner from interfering with reconnection of its subscribers at an apartment building. Because reconnection would have required attaching cable equipment to the building, the court reasoned the injunction would have been an uncompensated taking. (*Id.* at pp. 26–27.) The court commented, "The physical invasion of private property is no less an invasion if it is authorized by the courts through the granting of a preliminary injunction than if authorized by the Legislature enacting a statute mandating a right of access to cable companies. A taking of private property occurs in either case." (*Id.* at p. 27; see also *Judlo, Inc. v. Vons Companies* (1987) 211 Cal.App.3d 1020, 1027 [preliminary injunction requiring owner to permit plaintiff to place newsrack on owner's property "is an unconstitutional taking of private property without compensation"].)

26

showing the public has a right to access Martins Beach *that has been recorded or judicially determined.*[23]  Accordingly, regardless of the public access rights that may be legally established in the future, this court must presume the prior access was permissive and treat the trial court's injunction as temporarily restricting appellants' right to exclude the public from its property.  (See *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003, 1028–1029 [government cannot without compensation take easement that is not "a pre-existing limitation upon the land owner's title"]; *LT-WR, L.L.C. v. California Coastal Com.* (2007) 152 Cal.App.4th 770, 805 ["in the absence of a judicial determination that prescriptive rights exist for public use of [the property], the [Coastal] Commission's denial of a permit for gates and signs on the ground that potential prescriptive rights exist was speculative"]; *City of Needles v. Griswold* (1992) 6

_____

[23] In its brief, amicus curiae Coastwalk California argues the public trust doctrine supports a public claim of right to cross appellants' property to access Martins Beach. (See Cal. Const., art. X, § 4; Cal. Civ. Code § 670; *National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 434 ["the English common law evolved the concept of the public trust, under which the sovereign owns 'all of its navigable waterways and the lands lying beneath them "as trustee of a public trust for the benefit of the people" ' "]; *Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1174 ["In 1850, when California was admitted to the Union, it acquired ownership of all tidelands and the beds of all inland navigable waters within its borders."].)  It is not clear whether Coastwalk California contends the public trust doctrine *alone* provides the public the right to cross appellants' property to access the coast regardless of whether the history of use supports a finding of a dedication or a prescriptive right of access.  (Compare *Nollan v. California Coastal Commission* (1987) 483 U.S. 825, 832 (*Nollan*) [citing California cases as suggesting "that to obtain easements of access across private property the State must proceed through its eminent domain power," while acknowledging none of the cases "specifically addressed the argument that Art. X, § 4, allowed the public to cross private property to get to navigable water"] with *id.* at pp. 847–848 (dis. opn. of Brennan, J.) [suggesting that, in light of Article X, section 4, private landowner has no reasonable expectation of compensation where State acts to protect public access to coast].)  In any event, we need not and do not determine whether appellants' takings claim can be rejected on the basis that the public has a right to access the coast under the California Constitution.  Surfrider does not so argue, and, more fundamentally, we conclude appellants have not shown the trial court's injunction is a taking, even without considering the public trust doctrine.

Cal.App.4th 1881, 1888 (*City of Needles*) ["A temporary taking ordered during the pendency of an action to determine whether the taking may be made permanent, enjoys no constitutional exception."].)  Surfrider cites no authority to the contrary.

C.    *The Trial Court's Injunction is Not a Per Se Taking*

"[T]he Takings Clause 'does not prohibit the taking of private property, but instead places a condition on the exercise of that power.'  [Citation.]  In other words, it 'is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.'  [Citation.]  While scholars have offered various justifications for this regime, we have emphasized its role in 'bar[ring] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " (*Lingle*, *supra*, 544 U.S. at pp. 536–537.)

"In view of the nearly infinite variety of ways in which government actions or regulations can affect property interests," the United States Supreme Court has identified only certain narrowly-defined categories of "government interference with property" that are considered per se (or "categorical") takings.  (*Arkansas Game & Fish Commission v. United States* (2012) 568 U.S. 23, 31 (*Arkansas Game*); see also *Lingle*, *supra*, 544 U.S. at p. 538; *Powell v. County. of Humboldt* (2014) 222 Cal.App.4th 1424, 1436 (*Powell*).)  These include "regulations that completely deprive an owner of 'all economically beneficial us[e]' of her property," as well as governmental action that "requires an owner to suffer a permanent physical invasion of her property—however minor." (*Lingle*, at p. 538; see also *Arkansas Game*, at pp. 32–33.)  "[A]side from the cases attended by rules of this order, most takings claims turn on situation-specific factual inquiries." (*Arkansas Game*, at p. 32 [citing *Penn Central*, *supra*, 438 U.S. at p. 124].)

In *Penn Central*, *supra*, 438 U.S. 104, the Supreme Court prescribed "an 'ad hoc' factual inquiry" to determine when a regulation is a "restriction on the use of property that [goes] 'too far' " and, thus, constitutes a taking that requires compensation.  (*Horne*, *supra*, 135 S.Ct. at p. 2427.)  "That inquiry required considering factors such as the economic impact of the regulation, its interference with reasonable investment-backed

28

expectations, and the character of the government action." (*Ibid.*) As *Lingle* explained, "The Court in *Penn Central* acknowledged that it had hitherto been 'unable to develop any "set formula" ' for evaluating regulatory takings claims, but identified 'several factors that have particular significance.' . . . The *Penn Central* factors—though each has given rise to vexing subsidiary questions—have served as the principal guidelines for resolving regulatory takings claims that do not fall within the physical takings or [deprivation of all economically beneficial use] rules." (*Lingle*, 544 U.S. at pp. 538–539; *see also Murr v. Wisconsin* (2016) 137 S.Ct. 1933, 1942–1943 (*Murr*).)

Appellants contend the trial court's injunction constitutes a per se physical taking exempt from the multifactor *Penn Central* analysis because it stripped them of their right to exclude the public from Martins Beach. We conclude that, although the trial court's injunction effected a physical invasion analogous to an easement, the temporary nature of the injunction means it may not be treated as a per se taking. Because appellants make no attempt to show the injunction effected a taking under the *Penn Central* test (or any other multifactor test), we affirm.[24]

## 1. *Compulsory Permanent Easements That Are Not Proper Conditions On Development Are Per Se Takings*

The proposition that permanent physical invasions are per se takings is rooted in *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419 (*Loretto*), which held that a state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking. The court emphasized, "[t]he power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." (*Id.* at p. 435.) The court also stated, "physical *invasion* cases are special and . . . any permanent physical *occupation* is a taking." (*Id.* at p. 432; see also *Horne*, *supra*, 135 S.Ct. at p. 2429.) This is so "without regard to whether the action

---

[24] We need not and do not decide whether the trial court's injunction is literally a regulatory taking that must be analyzed under the *Penn Central* test or whether another multifactor test applies to the type of temporary physical invasion at issue in the present case. (See Part III.D, *post*.)

achieves an important public benefit or has only minimal economic impact on the owner." (*Loretto*, at pp. 434–435.)

In *Nollan*, *supra*, 483 U.S. 825, the Supreme Court applied *Loretto* in the context of a condition imposed on an owner seeking a development permit. There, the Coastal Commission required a beachfront property owner to convey an easement allowing the public to traverse a strip of the property to reach the shoreline as a condition of approval of the owner's permit to build a larger house. (*Id.* at pp. 828–829.) The court relied on *Loretto* in concluding the easement was "a 'permanent physical occupation' " of the property, because the public was "given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises." (*Id.* at p. 832; see also *Dolan v. City of Tigard* (1994) 512 U.S. 374, 384 [following *Nollan* with respect to condition requiring dedication of a bike/pedestrian path for approval of store expansion].) Accordingly, "had the government simply appropriated the easement in question, this would have been a *per se* physical taking." (*Lingle*, *supra*, 544 U.S. at p. 546 [discussing *Nollan* and *Dolan*]; see also *California Building Industry Assn.*, *supra*, 61 Cal.4th at pp. 457–458 [same].)

The question in both *Nollan* and *Dolan* was "whether the government could, without paying the compensation that would otherwise be required upon effecting such a taking, demand the easement as a condition for granting a development permit the government was entitled to deny." (*Lingle*, *supra*, 544 U.S. at pp. 546–547.) *Nollan* ultimately held the condition was an uncompensated taking because it did not "substantially advance the same government interest that would furnish a valid ground for denial of the permit." (*Lingle*, at p. 547; see also *Nollan*, *supra*, 483 U.S. at pp. 834–842; *Dolan*, *supra*, 512 U.S. at pp. 386–387.) In *Dolan*, although there was a relationship between the easement and the impact of the proposed store expansion, the Court concluded the city that imposed the easement condition had failed to demonstrate a " 'rough proportionality' " between the condition and "the impact of the proposed development." (*Dolan*, at p. 391; see also *id.* at pp. 395–396; *Lingle*, at p. 547; *Koontz v.*

30

*St. Johns River Water Mgmt. Dist.* (2013) 133 S.Ct. 2586, 2595 [*Nollan* and *Dolan* allow "the government to condition approval of a permit on the dedication of property to the public so long as there is a 'nexus' and 'rough proportionality' between the property that the government demands and the social costs of the applicant's proposal"].)

From *Nollan* and *Dolan*, as construed by *Lingle*, it is clear that government action imposing a permanent public access easement is generally treated as a per se taking requiring compensation, if not imposed as a proper adjudicative exaction. (*Lingle*, *supra*, 544 U.S. at p. 547 [*Nollan* and *Dolan* both involved "dedications of property so onerous that, outside the exactions context, they would be deemed *per se* physical takings"]; accord *California Bldg. Indus. Assn.*, *supra*, 61 Cal.4th at p. 460; see also *Alto Eldorado Partnership v. County. of Santa Fe* (10th Cir. 2011) 634 F.3d 1170, 1178 [the "permanent physical invasion[s]" in *Nollan* and *Dolan* were "easement[s] granting public way through private property"]; *Property Reserve*, *supra*, 1 Cal.5th at p. 196 ["It is well established that an easement may constitute a compensable property interest for purposes of the [state] takings clause."].)

2. *The Temporary Nature of the Trial Court's Injunction Means It May Not be Treated as a Per Se Taking*

Surfrider and amicus the Coastal Commission point to the language in *Loretto* describing the taking in that case as a "permanent physical invasion." (*Loretto*, *supra*, 458 U.S. at p. 432.) They emphasize the trial court's injunction is *not* permanent, because it only lasts until there is a decision on a CDP. We agree the temporary nature of the injunction means it may not be treated as a per se taking.

a. Loretto's *Permanency Requirement*

*Loretto* drew a distinction between the "permanence and absolute exclusivity of [the] physical occupation" in that case (cable company equipment attached to a building) and the "temporary limitations on the right to exclude" involved in other cases. (*Loretto*, *supra*, 458 U.S. at p. 435, fn. 12.) The classic "physical occupation," as defined by *Loretto* is a "permanent and exclusive occupation by the government that destroys the owner's right to possession, use, and disposal of the property. The Court defined the

31

destruction of these interests as follows: (1) possession, 'the owner has no right to possess the occupied space himself, and also has no power to exclude the occupier from possession and use of the space,' [citation]; (2) use, 'the permanent physical occupation of property forever denies the owner any power to control the use of the property; he not only cannot exclude others, but can make no nonpossessory use of the property,' [citation]; and (3) disposal, 'even though the owner may retain the bare legal right to dispose of the occupied space . . ., the permanent occupation of that space . . . will ordinarily empty the right of any value, since the purchaser will also be unable to make any use of the property.' " (*Boise Cascade, supra,* 296 F.3d at p. 1353, quoting *Loretto*, *supra*, 458 U.S. at pp. 435-436.)  Emphasizing the centrality of the permanency requirement to its per se rule, *Loretto* observed, "The cases state or imply that a physical invasion is subject to a balancing process, but they do not suggest that a permanent physical occupation would ever be exempt from the Takings Clause."  (*Loretto*, at p. 432.)

As cases involving only "temporary limitations on the right to exclude," *Loretto* mentioned the decision in *PruneYard Shopping Center v. Robins* (1980) 447 U.S. 74, as well as "the intermittent flooding cases."  (*Loretto*, *supra*, 458 U.S. at p. 435, fn. 12.)[25] In *PruneYard*, the Court upheld a state constitutional requirement that shopping center owners permit individuals to exercise free speech rights on their property.  *Loretto* explained that "temporary limitations are subject to a more complex balancing process to determine whether they are a taking.  The rationale is evident: they do not absolutely dispossess the owner of his rights to use, and exclude others from, his property."  (*Ibid*; see also *Powell*, *supra*, 222 Cal.App.4th at p. 1440, citing *Boise Cascade*, *supra*, 296 F.3d at pp. 1352–1353 ["Transient occupation is not a per se taking under *Loretto*,

---

[25] *Loretto* also referenced *Kaiser Aetna v. United States* (1979) 444 U.S. 164, in which the court held that owners who developed a marina by connecting a pond to the ocean could not be required to allow public access without compensation.  (*Loretto*, *supra*, 458 U.S. at p. 435, fn. 12.)  However, in *Lingle* the Supreme Court included *Kaiser Aetna* in a list of cases involving "permanent physical invasion[s]" that were per se takings.  (*Lingle*, *supra*, 544 U.S. at p. 539.)

however, as in a requirement to permit periodic onsite inspections."].) With regard to the flooding cases, *Loretto* stated, "this Court has consistently distinguished between flooding cases involving a permanent physical occupation, on the one hand, and cases involving a more temporary invasion, or government action outside the owner's property that causes consequential damages within, on the other. A taking has always been found only in the former situation." (*Loretto*, at p. 428; see also *Arkansas Game*, *supra*, 568 U.S. at p. 38 [multifactor test applies in determining whether temporary government-induced flooding is a taking].)

The Supreme Court in *Nollan* and *Dolan* continued the distinction made in *Loretto* between permanent physical occupations and temporary limitations on the right to exclude. In finding the easement at issue was a per se taking, *Nollan* emphasized it gave individuals "a permanent and continuous right to pass to and fro . . . ." (*Nollan*, *supra*, 483 U.S. at p. 832.) Further, in distinguishing *PruneYard*, *Nollan* pointed out that the case did not involve "a classic right-of-way easement" and "permanent access was not required." (*Nollan*, at p. 832, fn. 1.) Similarly, *Dolan* distinguished *PruneYard* by pointing out that the shopping center owners could adopt time, place, and manner restrictions, while the shop owner in *Dolan* was forced to accept a "permanent recreational easement." (*Dolan*, *supra*, 512 U.S. at p. 394.) Thus, although *Nollan* and *Dollan* extended *Loretto* to a situation where the owners were not excluded from using the portion of their property at issue (see *Loretto*, *supra*, 458 U.S. at p. 435, fn. 12 [referring to the "absolute exclusivity of a physical occupation"]), the easements were per se takings because the owners were permanently required to allow others to access their properties on an ongoing basis.

Some Federal Circuit decisions, starting with *Hendler v. United States* (Fed.Cir. 1991) 952 F.2d 1364, have raised questions about *Loretto's* permanence requirement. In determining whether government activity relating to wells for monitoring contaminated ground water was a physical taking, *Hendler* stated, "In this context, 'permanent' does not mean forever, or anything like it." (*Hendler*, at p. 1376.) *Hendler* continued, "If the term 'temporary' has any real world reference in takings jurisprudence, it logically refers

to those governmental activities which involve an occupancy that is transient and relatively inconsequential." (*Id.* at p. 1377.) In *Skip Kirchdorfer, Inc. v. United States* (Fed.Cir. 1993) 6 F.3d 1573 (*Skip Kirchdorfer*), the court stated that "a 'permanent' physical occupation does not necessarily mean a taking unlimited in duration. [Citation.] A 'permanent' taking can have a limited term. [Citation.] In *Hendler,* this court concluded that the distinction between 'permanent' and 'temporary' takings refers to the nature of the intrusion, not its temporal duration." (*Skip Kirchdorfer*, at p. 1582; see also *Otay Mesa Properties, L.P. v. United States* (Fed.Cir. 2012) 670 F.3d 1358, 1367 (*Otay Mesa*) [expressing agreement with *Hendler*].)[26]

However, other courts have rejected any suggestion that *Hendler* can be read to "abrogate" the "permanency requirement" in *Loretto*. (*Boise Cascade*, *supra*, 296 F.3d at p. 1356.) *Boise Cascade* involved a lumber company's complaint that steps taken by the U.S. Fish and Wildlife Service (Service) to protect spotted owls on a parcel of land owned by the company constituted takings. (*Id.* at pp. 1341–1343.) Among other things, the company contended there had been a physical taking under *Loretto* based on "the requirement that it allow government personnel to enter the property to conduct owl surveys during the pendency" of a preliminary injunction. (*Boise Cascade*, at pp. 1342–1343; see also *id.* at p. 1352.) The court concluded the complained of intrusion was *not* a per se taking under *Loretto*, where "the Service briefly entered the land over a period of five months in order to conduct owl surveys needed for the resolution of a lawsuit initiated by Boise." (*Boise Cascade*, at p. 1356.) The court characterized the intrusion as "extremely limited and transient" (*id.* at p. 1357) and pointed out the Service did not make a "permanent incursion" or add "any kind of permanent (or even temporary) addition to the landscape" (*id.* at p. 1356). It reasoned, "[t]he government's incursion into Boise's property is more in the nature of a temporary trespass—though, obviously,

---

[26] In *Skip Kirchdorfer*, *supra*, 6 F.3d at p. 1582, the Federal Circuit held the government's temporary seizure and occupation of a building constituted a per se taking, even though the owner retained some access. The court stated, "The limited duration of this taking is relevant to the issue of what compensation is just, and not to the issue of whether a taking has occurred." (*Id.* at p. 1583.)

sanctioned by the district court and therefore not unlawful—rather than a permanent physical occupation or an easement of some kind." (*Id.* at p. 1355.)

*Boise Cascade* acknowledged *Hendler*, but stated the decision had been "widely misunderstood and criticized as abrogating the permanency requirement established by the Supreme Court in *Loretto*." (*Boise Cascade*, *supra*, 296 F.3d at p. 1356.) *Boise Cascade* pointed out *Hendler's* discussion of the permanency requirement was dicta, because "[i]n *Hendler*, the government entered the land and placed upon it what were essentially permanent wells—wells that it intended to actively monitor over the years." (*Boise Cascade*, p. 1356.) *Boise Cascade* suggested that "in context, it is clear that the court [in *Hendler*] merely meant to focus attention on the *character* of the government intrusion necessary to find a permanent occupation, rather than solely focusing on temporal duration." (*Boise Cascade*, at p. 1356.) In *John R. Sand & Gravel Co. v. United States* (Fed.Cir. 2006) 457 F.3d 1345 (*John R. Sand & Gravel Co.*), the Federal Circuit attempted to harmonize the *Hendler* and *Boise Cascade* decisions, concluding "the determination of whether government occupancy is 'permanent' is highly fact-specific. In any event, the installation of fixed physical structures, such as the cable and cable connections in *Loretto* or the groundwater monitoring wells in *Hendler* is typical of a 'permanent' occupation, while the transient entry of persons via government authority on a plaintiff's property is generally not 'permanent.' " (*John R. Sand & Gravel Co.*, at p. 1357.)

The California Supreme Court addressed *Loretto's* permanency requirement in *Property Reserve*, *supra*, 1 Cal.5th 151, adopting *Boise Cascade's* view of *Hendler*. That case involved a trial court order authorizing the California Department of Water Resources (the Department) to enter private property to conduct environmental studies and geological testing regarding "the feasibility of constructing a new tunnel or canal in the Sacramento–San Joaquin Delta as a means of delivering fresh water from Northern California to Central and Southern California." (*Property Reserve,* at p. 165.) The issue in the case was whether the statutory pre-condemnation procedure employed by the

35

Department satisfied the requirements of the state takings clause.[27] (*Id.* at p. 167.) Although the court assumed for purposes of the decision that both the studies and the testing constituted "a taking or damaging of property for purposes of the state constitutional takings clause" (*ibid.*), the court nevertheless expressed doubt that the temporary physical invasions at issue could be considered per se takings.

Regarding the environmental studies, the state Court of Appeal had concluded "that in light of the number of days the trial court order permitted the Department's employees to enter and conduct the specified environmental activities on the landowners' property—from 25 to 66 days over a one-year period, depending upon the size of the property—and the fact that the order permitted the Department to conduct the environmental activities throughout the properties, the order granted the Department a blanket temporary easement that constituted a compensable property interest for purposes of the state takings clause." (*Property Reserve, supra*, 1 Cal.5th at p. 195.) The California Supreme Court expressed doubt the environmental testing activities constituted a taking. (*Id.* at p. 196.) The Court reasoned that, although the number of days of activity was "not insignificant, the activities . . . consist primarily of surveying and sampling activities that have been limited by the trial court so as to minimize any interference with the landowner's use of the property. The landowner will retain full possession of the property and no significant damage to the property is intended or anticipated." (*Ibid.*)

Regarding the geological testing, the Court of Appeal had concluded the activity was a taking because, as characterized by the Supreme Court, "the Department proposed to fill the holes that it bored in the property with a type of grout that would be left in the holes after the Department completed its investigatory activities." (*Property Reserve*,

---

[27] The owners' claims could not rest on the federal takings clause because the federal clause "has not been construed to require a state to adopt any particular type of eminent domain procedure or to compel a public entity either to initiate an eminent domain proceeding or to pay just compensation before engaging in conduct that results in a taking of property within the meaning of the federal takings clause." (*Property Reserve*, *supra*, 1 Cal.5th at p. 185.)

*supra*, 1 Cal.5th at p. 209.) The Supreme Court disagreed with the lower court. It acknowledged the Department's 1 to 14 days of activity around boring sites "may cause substantial interference with the landowner's possession and use of a portion of its property during the time the drilling activities are occurring." (*Ibid.*) Nevertheless, the court reasoned, "In our view, the *Loretto* decision cannot properly be interpreted to mean that a public entity that, after digging up soil or conducting other activities on private property that temporarily alter the property's condition, returns the property to the same or a comparable state as the property previously enjoyed, is to be viewed as having undertaken a permanent physical occupation of the property that amounts to a per se taking of a property interest." (*Id.* at p. 210.) The court continued, "Because here the Department would not retain possession of or any interest in the filling material after its testing is completed, the proposed geological activities do not involve any continued or permanent occupation of any portion of the landowners' property that would effectively impinge upon the owner's right to possess, use, or control the area in question. Under these circumstances, in our view the proposed drilling and refilling would not constitute a permanent physical occupation of a landowner's property within the meaning of the *Loretto* decision." (*Id.* at pp. 210–211.) The court quoted *Boise Cascade's* discussion of *Hendler* and noted that "[t]he facts of *Hendler* are quite different and distinguishable from the proposed geological activities at issue in this case." (*Property Reserve,* at p. 211, fn. 30.)

In sum, *Loretto* and its progeny demonstrate that for a physical invasion to be considered a per se taking, it must be permanent. Although the determination of whether an intrusion is permanent may in certain circumstances be highly fact-specific, it is nonetheless necessary for a finding there has been a per se taking. (*John R. Sand & Gravel Co., supra*, 457 F.3d at p. 1357; see also *Otay Mesa*, *supra*, 670 F.3d at p. 1364

37

[although the determination depends on the facts in the particular case, "[w]hether a taking is temporary or permanent is a question of law"].)[28]

                                  b.        Loretto's *Permanency Requirement Is Not Inconsistent With the Body of Law on Temporary Takings*

As explained above, *Loretto* and its progeny exclude temporary physical invasions from the category of per se takings. Appellants argue that such an interpretation of *Loretto* is inconsistent with the well-established body of law providing that temporary takings can be compensable. We disagree.

Appellants are absolutely correct that there is a well-established body of caselaw recognizing temporary takings. As explained by the United States Supreme Court in *Arkansas Game*, *supra*, 568 U.S. at pages 32–33, "[O]ur decisions confirm that takings temporary in duration can be compensable. This principle was solidly established in the World War II era, when '[c]ondemnation for indefinite periods of occupancy [took hold as] a practical response to the uncertainties of the Government's needs in wartime.' [Citation.] In support of the war effort, the Government took temporary possession of many properties. These exercises of government authority, the Court recognized, qualified as compensable temporary takings. . . . [¶] Ever since, we have rejected the argument that government action must be permanent to qualify as a taking. Once the government's actions have worked a taking of property, 'no subsequent action by the

---

[28] In *Otay Mesa, supra,* 670 F.3d 1358, the United States Border Patrol had placed sensors on private property to aid in the apprehension of border crossing violators. The sensors did not interfere with an owner's use of the property and would be removed whenever an owner notified the Border Patrol of an intention to develop an area on which a sensor was located. The issue in the case was whether the sensors effected a temporary or permanent taking, as relevant to the method of calculating just compensation. (*Id.* at p. 1364.) The court concluded the sensors were a permanent physical taking because only development or abandonment by the Border Patrol would end the occupation; also, the Border Patrol had "a 'perpetual' easement that reserves in the government the right to 'redeploy' the sensors in the case of" development of the property. (*Id.* at p. 1368.) Appellants point to no analogous circumstances that would make the trial court's injunction permanent. That the injunction will continue in place were appellants to fail to apply for a CDP does not convert the injunction into a permanent taking.

government can relieve it of the duty to provide compensation for the period during which the taking was effective.' " (See also *Otay Mesa*, *supra*, 670 F.3d at p. 1363 ["Although there has been some confusion over the use of the terms 'temporary' and 'permanent' in the takings context, [citations] it is clear that courts recognize both types of physical takings."].)

Those general principles do not, however, mean that temporary physical invasions are per se takings. In *Arkansas Game*, the Supreme Court rejected a contention that government-induced temporary flooding was automatically exempt from the takings clause compensation requirement. (*Arkansas Game*, *supra*, 568 U.S. at p. 38.) In summarizing the court's jurisprudence, the court emphasized the limited role for bright lines, stating, "In view of the nearly infinite variety of ways in which government actions or regulations can affect property interests, the Court has recognized few invariable rules in this area." (*Id.* at p. 31.) The court further explained, "we have drawn some bright lines, notably, the rule that a permanent physical occupation of property authorized by government is a taking. [Citing *Loretto*.] So, too, is a regulation that permanently requires a property owner to sacrifice all economically beneficial uses of his or her land. [Citation.] But *aside from the cases attended by rules of this order*, most takings claims turn on situation-specific factual inquiries. [Citing *Penn Central*]." (*Arkansas Game*, at pp. 31–32, emphasis added.) Ultimately, in rejecting the contention that temporary floods are *never* compensable, the court concluded, "When regulation or temporary physical invasion by government interferes with private property, our decisions recognize, time is . . . a factor in determining the existence *vel non* of a compensable taking." (*Id.* at p. 38.) Thus, as relevant to the present case, *Arkansas Game* reaffirmed the limited scope of *Loretto*'s per se rule.

Contrary to appellants' assertions, *Steinhart v. Superior Court* (1902) 137 Cal. 575 and *City of Needles*, *supra*, 6 Cal.App.4th 1881, do not support their per se takings claim. *Steinhart* held that, under the California Constitution, property may not be taken pending the final judgment in an eminent domain proceeding without prior compensation. (*Steinhart*, at p. 577 [in context of a proceeding to condemn a railroad right of way,

39

rejecting proposition that court may "authorize the party seeking to condemn to take immediate possession and to use the property pending the proceeding, and such possession does not constitute a taking within the meaning of the [California] constitution"].) *City of Needles* held that, under the California Constitution, a City could not, without prior compensation, retain possession and use of equipment belonging to the operator of a municipal golf course during the pendency of a proceeding relating to termination of the license to operate the course. (*City of Needles*, at pp. 1887–1889, 1892.) *Steinhart* and *City of Needles* make clear that temporary physical intrusions can be compensable takings under the California Constitution. But those cases did not characterize the temporary takings at issue as per se takings, and they did not suggest that *all* temporary physical invasions are per se takings under the state and/or federal Constitutions. Furthermore, as discussed previously, the California Supreme Court's recent decision in *Property Reserve* supports a conclusion that *not* all temporary physical invasions are takings that require prior compensation under the California Constitution. (*Property Reserve*, *supra*, 1 Cal.5th at pp. 196, 210–212 & fn. 30.)

Finally, we recognize the law has sanctioned the compensability of temporary easements. (See *Property Reserve*, *supra*, 1 Cal.5th at p. 199 & fn. 19 [referring to condemnation actions for "temporary construction easements"]; *id.* at p. 203, fn. 23 ["a number of out-of-state decisions have concluded that a public entity is required to condemn a temporary easement before undertaking significant precondemnation drilling or boring activities on private property"]; *id.* at p. 196 ["It is well established that an easement may constitute a compensable property interest for purposes of the takings clause."]; see also *United States v. Dow* (1958) 357 U.S. 17, 26 [referring to the possibility of compensation for "temporary use" of easement]; *Metropolitan Water Dist. of So. California v. Campus Crusade for Christ, Inc.* (2007) 41 Cal.4th 954, 975 [regarding compensation for temporary easements that interfere with an owner's intended use]; *City of Fremont v. Fisher* (2008) 160 Cal.App.4th 666, 676 [same].) However, none of those cases referred to the temporary easements as per se takings. It may be that certain types of temporary physical invasions are frequently and easily characterized as

40

takings. But appellants cite no case supporting the proposition that the courts have created a category of per se takings covering temporary physical invasions, such that the invasions are always takings, "without regard to whether the action achieves an important public benefit or has only minimal economic impact on the owner." (*Loretto*, *supra*, 458 U.S. at pp. 434–435; see also *Arkansas Game*, *supra*, 568 U.S. at pp. 31–32 [alleged takings not covered by the recognized categorical rules are considered under a multifactor test, such as the *Penn Central* test].)[29]

Because the trial court's injunction is not a permanent intrusion on appellants' right to exclude others, it is not a per se physical taking.

D.      *Appellants Do Not Contend the Injunction is a Taking Under a Multifactor Analysis, Such as the* Penn Central *Test*

As noted previously, takings claims that are not encompassed within the United States Supreme Court's limited per se rules are analyzed under a multifactor test, generally the *Penn Central* framework for regulatory takings. (*Arkansas Game*, *supra*, 568 U.S. at pp. 31–32.) The trial court's injunction constitutes a physical invasion designed to enforce the Coastal Commission's regulatory authority. It is unclear whether the injunction should be regarded as an alleged regulatory taking that must be analyzed

---

[29] In *Tahoe-Sierra P. Council v. Tahoe RPA* (2002) 535 U.S. 302 (*Tahoe*), the Supreme Court stated, "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner [citation] regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof. Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary." (*Id.* at p. 322.) The court cited *United States v. General Motors Corp.* (1945) 323 U.S. 373, in which the court determined just compensation where the government took "temporary occupancy of a portion of a leased building." (*General Motors*, at p. 375.) The language in *Tahoe* is dicta, because the issue in the case was whether a regulation that temporarily deprived a property of all economic use was a per se taking. (*Tahoe*, at p. 334.) But, in any event, even if *Tahoe* can be read to identify a new category of per se takings for temporary government occupations of property, there was no such exclusive occupation in the present case. (See *Boise Cascade*, *supra*, 296 F.3d at p. 1357 [characterizing cases cited by *Tahoe* as "per se takings" but noting they involved temporary "total occupation of the property by the government"].)

41

under the *Penn Central* test, or whether another multifactor test applies to the type of temporary physical invasion at issue. We recognize regulatory takings are generally described as restrictions on the use of property. (See, e.g., *Horne*, *supra*, 135 S.Ct. at p. 2427 [describing a " 'regulatory taking' " as a "restriction on the use of property that went 'too far' "]; but see *Lingle*, *supra*, 544 U.S. at p. 538 [characterizing a law requiring "an owner to suffer a permanent physical invasion of her property" as a type of "regulatory action" that is a per se taking].)[30] And, we also recognize that *Arkansas Game* held that takings claims based on temporary government-induced flooding (an apparent temporary physical invasion) are subject to a multifactor test different from the *Penn Central* test. (*Arkansas Game*, at p. 38–39.) Below, we briefly summarize the multifactor tests described in *Penn Central* and *Arkansas Game* and describe some of the relevant considerations in the present case. But, because appellants do not contend the injunction is a taking under a multifactor test, we need not and do not decide what multifactor test would apply, and we in any event lack the evidence necessary to perform such an analysis.

In *Penn Central*, the court explained, "The question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty. While this Court has recognized that the 'Fifth Amendment's guarantee . . . [is] designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole,' [citation], this Court, quite simply, has been unable to develop any 'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons. [Citation.] Indeed, we have frequently observed that whether a particular restriction will be rendered invalid by the government's failure to pay for any losses

---

[30] In the recent *Murr* decision, the United States Supreme Court referenced "the contrast between regulatory takings, where the regulation affects the property's value to the owner, and physical takings, where the impact of physical appropriation or occupation of the property will be evident." (*Murr, supra,* 137 S.Ct. at p. 1944.)

proximately caused by it depends largely 'upon the particular circumstances [in that] case.' " (*Penn Central*, *supra*, 438 U.S. at pp. 123–124.)  The court identified several "significan[t] factors that guide "these essentially ad hoc, factual inquiries." (*Id.* at p. 124.)  One is "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations." (*Ibid.*)  Another is "the character of the governmental action.  A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government, [citation], than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." (*Ibid.*)

Although the United States Supreme Court in *Arkansas Game* did not appear to hold that takings claims based on temporary flooding are literally subject to the *Penn Central* test, the court outlined factors for consideration similar to those in *Penn Central*.  Thus, the court stated that "time is indeed a factor in determining the existence *vel non* of a compensable taking." (*Arkansas Game*, 568 U.S. at p. 38.)  Also relevant is the foreseeability of the invasion, "the character of the land at issue and the owner's 'reasonable investment-backed expectations' regarding the land's use," and the "[s]everity" of the interference.  (*Id.* at p. 39.)

Clearly, whether under *Penn Central* or a different multifactor test, the analysis to determine whether a temporary physical invasion is a taking is complex.  The analysis requires the courts to consider the nature of the burden imposed on the claimant, in light of the factual and legal context.  (See *Arkansas Game*, 568 U.S. at pp. 38–40; *Penn Central*, *supra*, 438 U.S. at pp. 128–137.)  In this case, the relevant background would seem to include, among other things, the history of public access at Martins Beach, the record of communications between appellants and the County and the Coastal Commission, the purposes and functioning of the Coastal Act, and the public trust doctrine.  The analysis also imposes an evidentiary burden on the party claiming to be subject to a taking, including the necessity of putting on evidence regarding the impact of the claimed taking (here, a temporary injunction requiring limited public access),

43

including the degree of interference with " 'reasonable investment-backed expectations.' " (*Arkansas Game*, 568 U.S. at p. 39; see also *Penn Central*, *supra*, 438 U.S. at p. 124; *Keystone Bituminous Coal Assn. v. DeBenedictis* (1987) 480 U.S. 470, 485 [claimant bears burden of showing taking]; *Seiber v. United States* (Fed.Cir. 2004) 364 F.3d 1356, 1372 [claimants' "temporary takings claim also fails under the *Penn Central* test because they 'failed to introduce convincing evidence to show the amount, if any, by which the value of the relevant property . . . was reduced' by the alleged temporary taking"].)

Appellants in the present case elected *not* to assert a claim that the trial court's injunction is a taking under the *Penn Central* test or any other multifactor analysis. Appellants did argue below an injunction would constitute an unconstitutional taking. But completely absent from the record is any reliance by appellants on the *Penn Central* or any other multifactor test and any evidence presented by appellants supporting such an analysis.[31] Appellants' briefs on appeal do not attempt to show the trial court's injunction is a taking under *Penn Central* or another multifactor test.[32] Finally, at oral argument counsel for appellants reaffirmed they contend only that the trial court's

---

[31] No argument based on the *Penn Central* or another multifactor test can be found in appellants' trial brief, closing brief, objections to the trial court's tentative statement of decision, objections to the proposed judgment, or motion for new trial below.

[32] In support of a different argument that the trial court's injunction forced them to operate a parking business at a net loss, appellants point to testimony from the manager of Martins Beach that improvements, including a new bathroom, would cost over $500,000, and annual costs would exceed $100,000. However, the injunction does not obligate appellants to provide staff or any amenities. Instead, it requires, "The gate across Martins Beach Road must be unlocked and open to the same extent that it was unlocked and open at the time [appellants] purchased the property." Surfrider points out that, if appellants decided to stop spending funds on maintaining beach access, section 846 of the Civil Code would protect them from liability for any hazardous conditions that developed. Appellants do not dispute Surfrider's interpretation of that statute. Thus, appellants' claim that the injunction forced them to operate a business is without merit, and the evidence presented on that issue would not support a finding of a taking under a multifactor analysis, even if appellants had made such a claim.

injunction is a per se taking. Accordingly, there is no basis to reverse the injunction under any multifactor test for finding a taking.[33]

IV.    *The Trial Court Did Not Abuse Its Discretion in Awarding Attorney Fees*

Appellants contend the trial court erred in granting Surfrider's motion for attorney fees under California Code of Civil Procedure section 1021.5. A plaintiff is eligible for fees under that section when: (1) the action " 'has resulted in the enforcement of an important right affecting the public interest;' " (2) " 'a significant benefit, whether pecuniary or nonpecuniary has been conferred on the general public or a large class of persons;' " and (3) " 'the necessity and financial burden of private enforcement are such as to make the award appropriate.' " (*Woodland Hills Residents Assn. Inc. v. City Council of Los Angeles* (1979) 23 Cal.3d 917, 934–935 (*Woodland Hills*); see also Cal. Code Civ. Proc., §1021.5.) The trial court did not abuse its discretion.

"Whether the moving party has satisfied the statutory requirements so as to justify a fee award is a question committed to the discretion of the trial court; we review the ruling for abuse of discretion. [Citations.] An abuse of discretion occurs if, in light of the applicable law and considering all of the relevant circumstances, the court's decision exceeds the bounds of reason and results in a miscarriage of justice. [Citations.] This standard of review affords considerable deference to the trial court provided that the court acted in accordance with the governing rules of law. We presume that the court properly applied the law and acted within its discretion unless the appellant affirmatively shows otherwise." (*Mejia v. City of Los Angeles* (2007) 156 Cal.App.4th 151, 158.)

As to the first factor, appellant contends the present action has not " 'resulted in the enforcement of an important right affecting the public interest' " (*Woodland Hills*,

---

[33] Appellants also contend the trial court's judgment violated their constitutional right to free speech because it included "changing the messages on the billboard on the property" in a list of actions appellants took without a CDP in violation of the Coastal Act. However, the injunction requires nothing with respect to the billboard, and appellants have not been assessed penalties for violating the Coastal Act in that (or any other) respect. If the Coastal Commission denies appellants a CDP and requires them to advertise beach access, a free speech claim might be ripe for review. But the cases appellants cite do not establish a basis for relief at this time.

45

*supra*, 23 Cal.3d at p. 935) because it only resulted in enforcement of the Coastal Act permitting requirement as to Martins Beach. Appellants' cases do not demonstrate there is any such bright line rule. Appellants primarily rely on *Norberg v. California Coastal Com.* (2013) 221 Cal.App.4th 535, in which a property owner "sought to invalidate permit conditions affecting planned residential improvements on his privately owned oceanfront property." The court acknowledged that "the proper application of statutory language . . . is an important right," but rejected the proposition that "the private attorney general doctrine was designed to reward plaintiffs who, in pursuit of their own interests, just happened to bring about the enforcement of a statute that benefits the public." (*Norberg*, at p. 541; see also *Beach Colony II v. California Coastal Com.* (1985) 166 Cal.App.3d 106, 114 ["Section 1021.5 was not designed as a method for rewarding litigants motivated by their own pecuniary interests who only coincidentally protect the public interest."].) *Norberg* is inapposite: Surfrider brought the present action to enforce the Coastal Act for the benefit of the public, not its own narrow interests. (See *Landgate, supra*, 17 Cal.4th at p. 1018 ["a rational permit regulation scheme is imposed on the public as a whole to ensure the orderly development of real property"].)

As to the second factor, appellants dispute the action conferred a "significant benefit," again citing *Norberg*. However, *Norberg* is again inapposite. There, the action achieved only "the invalidation of a permit condition affecting one parcel of privately owned real property" and the trial court's decision had "no precedential value and, consequently, [did] not confer a substantial benefit, or any benefit, on a large class of persons." (*Norberg, supra*, 221 Cal.App.4th at p. 542; see also *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, 167 ["The decision vindicated only the rights of the owners of a single parcel of property."].) In contrast, the present action resulted in a legal interpretation of the term "development" in the Coastal Act that, by virtue of the present decision, will have precedential value. The significance of that legal determination is attested by the amicus curiae briefs filed in support of both parties on appeal. Amicus the Pacific Legal Foundation argues, for example, "This [c]ourt's

decision will extend far beyond this case, and may affect many ordinary coastal homeowners."

As to the third factor, appellants contend private enforcement by Surfrider was unnecessary because "the enforcement action was duplicative of activity already underway by *both* the County of San Mateo *and* the Coastal Commission." However, the record citations provided by appellants do not demonstrate the existence of enforcement actions sufficient to show an abuse of discretion. Instead, the record citations reveal a series of correspondence between appellants and the County and the Coastal Commission between 2009-2014. None of the record citations indicate any enforcement action had been commenced by the time the present action was filed in March 2013. Indeed, in a December 2014 letter the Coastal Commission was still urging appellants to voluntarily remedy Coastal Act violations identified in a notice of violation dated September 2011. There is no indication in the record that the County or the Coastal Commission has at any point initiated a serious enforcement action, such as imposition of penalties under section 30821. Moreover, there is no indication in the record that appellants have filed for a CDP. Finally, although section 6213.5 authorizes the State Lands Commission to obtain an "access easement" by eminent domain, this action seeking to determine whether closure of beach access constitutes development under the Coastal Act is distinct. In sum, this is not a case in which "the public rights in question were adequately vindicated by governmental action." (*In re Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1215 (*Whitley*).)[34]

---

[34] We also reject appellants' assertion that the cost of litigation did not transcend Surfrider's individual stake in the suit. Appellants have not shown Surfrider has the type of pecuniary interest that might justify denial of fees under that factor. (See *Whitley*, *supra*, 50 Cal.4th at p. 1211 ["a litigant who has a financial interest in the litigation may be disqualified from obtaining such fees when expected or realized financial gains offset litigation costs"].) Appellants cite no cases to support their novel assertion that boils down to an argument that fees should be denied to Surfrider because preserving beach access is part of the organization's mission. That perverse rule would discourage the valuable contributions of nonprofit organizations in private attorney general actions. (See *ibid.* ["We conclude that a litigant's personal nonpecuniary motives may not be used to

Appellants have not demonstrated the trial court abused its discretion in awarding attorney fees to Surfrider.

## DISPOSITION

The trial court's judgment is affirmed. Respondent is awarded its costs on appeal.

---

disqualify that litigant from obtaining fees under Code of Civil Procedure section 1021.5."].) Revealingly, appellants make no attempt to defend the argument in their reply brief.

_____
SIMONS, Acting P.J.

We concur.

_____
NEEDHAM, J.

_____
BRUINIERS, J.

(A144268, A145176)

49

Superior Court of the San Mateo County, No. CIV520336, Hon. Barbara J. Mallach, Judge.

Bancroft, Paul D. Clement, Erin E. Murphy; Hopkins and Carley, Jeffrey E. Essner, Allonn E. Levy, and Dori L. Yob, for Defendants and Appellants.

J. David Breemer, and Raymond J. Nhan for Pacific Legal Foundation, California Farm Bureau Federation, California Cattlemen's Association, Western Manufactured Housing Communities Association, California Association of Realtors, and California Business Properties Association as Amici Curiae on behalf of Defendants and Appellants.

Cotchett, Pitre & McCarthy, Joseph W. Cotchett, Eric Buescher; Mark A. Massara; Law Office of Herb Fox and Herb Fox, for Plaintiff and Respondent.

Kamala Harris, Attorney General, John Saurenman, Senior Assistant Attorney General, Christiana Tiedmann, Deputy Attorneys General; John C. Beiers and Joel Jacobs, County Counsel (San Mateo), John D. Nibbelin, Chief Deputy County Counsel, Kimberly A. Marlow, Deputy County Counsel for California Coastal Commission and County of San Mateo as Amici Curiae on behalf Plaintiff and Respondent.

Environmental Law Clinic Mills Legal Clinic at Stanford Law School, Deborah A. Sivas, Alicia E. Thesing, Elizabeth Jones, and Elizabeth M. Vissers for Coastwalk California as Amicus Curiae on behalf of Plaintiff and Respondent.