Filed 2/27/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| CORY SPENCER et al., | B309225 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC629596) |
| v. | |
| CITY OF PALOS VERDES ESTATES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Carolyn Kuhl, Judge; Amy D. Hogue, Judge. Reversed.

Hanson Bridgett, Gary A. Watt, Kurt A. Franklin, Lisa M. Pooley, Samantha D. Wolff, Sean G. Herman, Ellis F. Raskin; Otten Law and Victor J. Otten for Plaintiffs and Appellants.

Kutak Rock, Edwin J. Richards, Antoinette P. Hewitt, Kevin J. Grochow and Rebecca L. Wilson for Defendant and Respondent.

Rob Bonta, Attorney General, Daniel A. Olivas, Assistant Attorney General and Jamee Jordan Patterson and Jennifer W. Rosenfeld, Deputy Attorney General, for California Coastal Commission as Amicus Curiae.

—————————————

### *INTRODUCTION*

Lunada Bay is a premier surf spot located in, and owned by, the City of Palos Verdes Estates. According to plaintiffs, City residents and officials are not welcoming to outsiders and are sometimes openly hostile towards them. The Lunada Bay Boys (Bay Boys) are a group of young and middle-aged men, local to the City, who consider themselves to be the self-appointed guardians of Lunada Bay. One of their tenets is to keep outsiders away from the surf location. They accomplish this through threats and violence. Plaintiffs are (1) two non-locals who encountered harassment by the Bay Boys when they tried to surf Lunada Bay, and (2) a non-profit dedicated to preserving coastal access. They brought suit against the Bay Boys, some of its individual members, and the City itself, for conspiracy to deny access under the California Coastal Act. (Pub. Resources Code, § 30000 et seq.)[1] We previously affirmed the denial of an anti-SLAPP motion brought by a number of the individual defendants. (*Spencer v. Mowat* (2020) 46 Cal.App.5th 1024.) We now address the City's successful motion for judgment on the pleadings.

Plaintiffs allege that the City conspired with the Bay Boys essentially to privatize Lunada Bay, depriving nonlocals of access, in at least two ways: (1) by allowing the Bay Boys to build on City property a masonry and wood structure, known as the Rock Fort, which the Bay Boys used as their hangout; and (2) with knowledge of the Bay Boys' conduct, being complicit in the Bay Boys' harassing activities and tacitly approving them.

The trial court granted the City judgment on the pleadings, on the joint bases that: (1) merely allowing the Rock Fort to be

---

[1] All further statutory references are to the Public Resources Code unless otherwise stated.

2

built was not actionable against the City, in the absence of allegations that the City *itself* performed its construction or entered into an advance agreement that it be built; and (2) condoning the Bay Boys' acts of harassment is not a Coastal Act violation as neither harassment itself, nor standing by while it occurs, is conduct reached by the Act.[2]  We reverse on both theories.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1.    *Overview of the Litigation Against the City*[3]

The operative complaint is the fourth amended complaint.[4] The fourth amended complaint did not come about exclusively by adversarial law and motion practice.  Plaintiffs' second amended

---

[2]     The California Coastal Commission filed an amicus curiae brief that argues for "reversal of the trial court's entry of judgment for the City."  The City has filed an answer to the Commission's amicus brief.

[3]     The only cause of action asserted against the City is the violation of the Coastal Act.  In this opinion, we are not concerned with any of the defendants other than the City, nor any of the non-Coastal Act causes of action alleged against those defendants.  The parties have informed us, however, that plaintiffs have reached settlements with a number of the individual Bay Boy defendants.

[4]     The procedural history precedes the filing of the initial complaint in this action.  This lawsuit actually began in federal court, but the district court abstained from resolving the Coastal Act cause of action, so plaintiffs refiled in state court.  The operative complaint is entitled: "FOURTH AMENDED CLASS ACTION COMPLAINT . . . ."  No class action allegations were asserted against the City.

complaint, including exhibits, exceeded 200 pages. The court, on its own motion, "in an effort to more effectively manage the case," issued an order granting plaintiffs 10 days in which to file a third amendment complaint "that (excluding exhibits) is not longer than 25 pages." The court explained, "From the Court's point of view, the purpose of a complaint is to plead ultimate facts sufficient to state actionable claims and give notice to the defendants of the claims alleged against them. As drafted, the Second Amended Complaint is repetitive and includes information that goes well beyond the ultimate facts."

Plaintiffs complied, eventually resulting in the operative complaint.[5] The City answered with a general denial and affirmative defenses. Thereafter, it moved for judgment on the pleadings. In opposition to the motion, plaintiffs sought judicial notice of their second amended complaint, as illustrative of the complete facts they could plead. Plaintiffs explained, "To the extent the court now believes Plaintiffs need to provide more facts, the Plaintiffs can add these and others back in."[6]

The court ultimately granted the motion for judgment on the pleadings, with leave to amend the complaint in a manner not addressed by plaintiffs in the operative, or any prior,

---

[5] The third amended complaint was challenged by a partially successful motion to strike punitive damages alleged against the individual defendants. This resulted in the operative fourth amended complaint; the last amendment had no effect on the allegations against the City.

[6] The City opposed plaintiffs' request for judicial notice in the trial court. The record on appeal does not reflect any ruling on the motion. The parties do not address the trial court judicial notice request in their briefs.

4

complaint (specifically, to allege the City's involvement in the initial construction of the Rock Fort). Plaintiffs declined to do so, and the court entered judgment on the pleadings.

On appeal, the parties dispute whether – and to what extent – plaintiffs can rely on the allegations of their second amended complaint in their challenge to the judgment on the pleadings. While the City is correct that the allegations of that complaint have been superseded, it is also clear that those allegations were removed because the trial court believed plaintiffs had pleaded "information that goes well beyond the ultimate facts," not due to any ruling on a demurrer or motion to strike. In addition, several exhibits were attached to the earlier pleading, which were not disputed in terms of authenticity, and also appear to have been removed from subsequent pleadings solely in order to comply with the court's request as to length. Based on these circumstances, from time to time, we refer to the allegations in the second amended complaint to provide context.

2.    *Allegations of the Operative Complaint*

The premise of plaintiffs' complaint against the City is that the Coastal Act requires a permit for all "development." The Coastal Act defines "development" broadly, and includes, a *"change in the intensity of use of water, or of access thereto; construction, reconstruction, demolition, or alteration of the size of any structure . . . ."* (§ 30106, italics added.) There are two claimed "development activities" at issue in this appeal:  (1)  the construction of the Rock Fort ("construction . . . of any structure") and (2)  the harassment conducted by the Bay Boys (activities resulting in a "change in the . . . use of water or of access thereto").

5

Plaintiffs allege the City violated the Coastal Act by not obtaining a Coastal Development Permit for these two "development activities" occurring on its property at Lunada Bay. Plaintiffs allege these Coastal Act violations entitle plaintiffs to declaratory and injunctive relief, and render the City liable for civil and daily fines payable to the State.

### A. Allegations Relating to the Rock Fort[7]

As to the Rock Fort, plaintiffs allege the Bay Boys "built and maintained the illegal Rock Fort. The City was long aware of it and only removed the structure in late 2016, after Plaintiffs brought attention in [their federal] lawsuit. With City knowledge, the Bay Boys have since undertaken efforts to rebuild a structure in its place on City property." In their second amended complaint, plaintiffs had alleged that the Rock Fort "serves as the headquarters for the Bay Boys to harass visitors."

The California Coastal Commission was created by the Coastal Act, and has "primary responsibility for the implementation" of the Act. (§ 30330.) The operative complaint alleges that, on January 21, 2016, the Coastal Commission wrote then City Police Chief Jeff Kepley to advise him that, among other things, the City must address the unpermitted Rock Fort. The letter itself was attached to the second amended complaint. The letter, written by an Enforcement Analyst at the Commission, explains that the Commission had received reports

---

[7] Plaintiffs briefly allege a few other physical developments in addition to the Rock Fort, including a campfire ring, two trails, and other developments which plaintiffs were still investigating. As we conclude judgment on the pleadings should not have been granted with respect to the Rock Fort, we need not address the other alleged physical developments, and express no opinion on them.

6

"of unpermitted structures, including stone forts, constructed on the shoreline of Lunada Bay."  The Enforcement Analyst goes on to explain that "the construction of a structure" constitutes a "development that is within the power of the City to address" and which, if not authorized, would constitute a Coastal Act violation.

The operative complaint alleges a June 6, 2016 follow-up letter from the Enforcement Analyst, this time addressed to the City Manager.  This letter, too, was attached to the second amended complaint.  It confirms there had been a meeting between City staff and Commission staff where, among other things, Commission staff had inspected "the unpermitted stone fort."  The letter restates the Commission's position that "in order to resolve the issue of the unpermitted stone fort, the City must obtain a Coastal Development Permit to either remove or retain the stone fort.  As we conveyed to you at the meeting, given the inconsistency with policies of the Coastal Act . . . , it is not likely that staff could support approval of a private structure on the shoreline, such as in the location of the stone fort."  The Enforcement Analyst went on to explain that, in order for a request to retain the Rock Fort, even if reduced in size, to be favorably considered, it should be accompanied by a proposal to institute "a comprehensive public access program" that, among other things, clearly identifies the structure "as a public amenity and open to all."  The Commission requested that the City begin the process of obtaining a Coastal Development Permit "in order to as quickly as possible start to resolve the issue of the unpermitted stone fort and in doing so eliminate any negative effect it may have as a quasi-private structure on public access to the coast."

The operative complaint alleges that the City ultimately "issued a memorandum recommending that a public hearing [be held] to discuss removal of the unpermitted Rock Fort." Again, the actual documentation was attached to the second amended complaint. A memorandum was prepared for a July 12, 2016 City Council meeting, discussing the issue. The memorandum describes the Rock Fort as a "patio." It explains, "The structure was constructed without City approval by unidentified persons. It is believed that members of the public approximately 30 years ago began constructing the stone retaining walls and a patio structure along the northwestern section of Lunada Bay.[8] The location is adjacent to the closest access point to the surf and provides a viewing spot of the coast and surfing activity. Over time, a barbeque, table, seating and shade structures were added. The patio structure is a congregation area. Concerns over 'localism' caused by certain individuals dissuading or intimidating the general public from enjoying Lunada Bay resulted in the City adopting an ordinance in 2002 addressing the use of public beaches and prohibiting conduct that blocks access [citation]. In 2002, the City also removed the shade structure and other components of the unauthorized patio. The stone retaining walls and raised stone floor were left in place." The

---

[8] In its motion for judgment on the pleadings, and again on appeal, the City argues that there are no facts alleged to show that the Rock Fort was constructed after the effective date of the Coastal Act. The Coastal Act was enacted in 1976 (§ 30000), so became effective January 1, 1977. The City's 2016 memorandum suggests construction was started "approximately 30 years ago," or 1986, nearly a decade after the effective date of the Coastal Act.

memorandum indicated that the City recently obtained a geotechnical report which confirmed that the Rock Fort could be safely removed. The memo concluded by recommending seeking a permit for the Rock Fort's immediate removal.

Plaintiffs allege in the operative complaint that the City removed the Rock Fort "in late 2016."[9] They further allege, "With City knowledge, the Bay Boys have since undertaken efforts to rebuild a structure in its place on City property."

B. *Allegations Related to Bay Boys' Harassment*

Plaintiffs allege the Bay Boys have "intentionally and maliciously blocked public access to the beach at Lunada Bay for over 40 years. In what is a multi-generational practice of extreme 'localism,' the Bay Boys use physical violence, threats of bodily harm, vandalism to vehicles, verbal harassment and intimidation to prevent access to the public beach. The City . . . has long been aware of the unlawful exclusion of outsiders and has conspired with the Bay Boys to 'protect' Lunada Bay." Specifically, plaintiffs allege that, "[w]ith City knowledge and complicity, the individual Defendant members of the Bay Boys conspire to keep the public away by: (1) physically obstructing outsiders' access to the beach trails; (2) throwing rocks; (3) running people over with surfboards in the water; (4) punching outsiders; (5) stealing outsiders' wallets, wetsuits, and surfboards; (6) vandalizing vehicles, slashing tires, and waxing pejorative slurs onto vehicle windows; (7) levying threats; and (8) intimidating outsiders with pejorative and other verbal insults, gestures, and threats of serious injury."

---

[9] It is not disputed that the City removed the Rock Fort. The record does not indicate the City obtained a permit to do so.

In the operative complaint (with greater detail in their second amended complaint), plaintiffs allege the Bay Boys planned and effectuated a strategy of harassing, threatening, and assaulting nonlocal beachgoers in order to keep them away from Lunada Bay.  On appeal from a motion for judgment on the pleadings, we assume these facts are true.  (*Shea Homes Limited Partnership v. County of Alameda* (2003) 110 Cal.App.4th 1246, 1254 [in reviewing a judgment on the pleadings, all material factual allegations are accepted as true].)

In their briefs, the parties quarrel about the allegations that the City is complicit in the Bay Boys' harassment.  The fourth amended complaint alleges that it is.  Indeed, the complaint, no less than five times, alleges that the Bay Boys acted with City "complicity."  A section of the complaint entitled, "The City's Response to (and Complicity in) the Bay Boys' Acts of Exclusion" alleges in substance the following:  In 2015, the City hired Jeff Kepley as its new chief of police.  Kepley was quoted in the Los Angeles Times as saying he was going to mix up the status quo and make an example of anyone who behaves criminally at Lunada Bay.  City residents, including members of the Bay Boys, criticized this plan and Chief Kepley "backtracked."  "In response, rather than hold the Bay Boys accountable, the City opted for a 'community policing' approach to develop an even cozier relationship with the Bay Boys."[10]

---

[10] To the extent the City argues the allegations of complicity are conclusory, we disagree.  Plaintiffs' specific allegations of the police's community policing approach and cozy relationship with the Bay Boys are sufficient allegations of ultimate facts.  Any clarification was spelled out in more detail – detail the trial court found excessive – in the second amendment complaint, e.g. "As succinctly stated by former City Chief of Police Timm Browne:

Plaintiffs also allege in the operative complaint that the City enforces its laws in a discriminatory manner against outsiders, while allowing the Bay Boys to continue their harassment unabated. They alleged, "While no scienter is required to hold the City accountable for violations, the City has long known about the Coastal Act violations, which continue in Lunada Bay and other areas of [the City]. For decades, . . . the City has condoned and conspired with the Individual Defendants' and Defendant Bay Boys' threatening behavior discouraging outsiders from accessing Lunada Bay, and to exclude under-represented persons from its coastline by targeting them with unfavorable treatment for traffic citations, parking tickets, and towed vehicles."

### 3. *Motion for Judgment on the Pleadings*

The operative complaint alleged that the City was liable for Coastal Act violations, in that both the Rock Fort and the harassing conduct constituted "development activity" for which a Coastal Development Permit was required. On February 14, 2020, the City moved for judgment on the pleadings on the basis that neither the Rock Fort nor the harassment constituted "development" within the meaning of the Coastal Act.

---

[¶] 'People here do not like outsiders in general. Umm, I mean, they pay a price to live here. Umm, they have beautiful views of the ocean from most of the homes in the City . . . so, uh, they are protective of their community as a whole, umm, I mean surfers or non-surfers.' "

11

In support of its motion, the City sought judicial notice of a number of documents, including the nearly 9000-page legislative history of the Coastal Act.[11]

On July 14, 2020, following briefing and a hearing, the court issued its order granting the motion for judgment on the pleadings, with leave to amend. The court explained that it agreed generally with the City that the Coastal Act creates liability only against a developer who fails to comply with the permitting process, not a city on whose land the development sits. As to the Rock Fort, the court granted leave to amend to allege that City agents or employees built the Rock Fort "and/or entered into advance agreements to have other defendants construct" it. As to harassment, the court concluded that development under the Coastal Act related to " 'the use of buildings, structures and land' as between . . . competing uses," and not "interpersonal conduct." The court stated that even if plaintiffs had alleged City employees themselves had assaulted them, this would not constitute a Coastal Act violation, because "it is not 'development' under the Coastal Act even if the perpetrator is motivated by a desire to deny access to or use of water."

Plaintiffs declined to amend their complaint to allege direct City involvement in the construction of the Rock Fort, and

---

[11] The trial court does not appear to have ruled on the request. On appeal, the City asks us to take judicial notice of the legislative history of the Coastal Act, as well as an additional document. Plaintiffs also requested judicial notice of documents on appeal: we previously granted one request and deferred the second. We now grant the parties' outstanding requests for judicial notice; however, we disregard all documents not relevant to our disposition of the appeal.

12

judgment was entered in the City's favor. Plaintiffs filed a timely notice of appeal.[12]

## *DISCUSSION*

After discussing the standard of review, we provide an overview of the Coastal Act, its goals, and the statutory definition of "development." Next, we address the Rock Fort, and conclude that the City may be liable for its maintenance on City property when no Coastal Development Permit had been obtained. Then, we turn to the City's potential Coastal Act liability for Bay Boy harassment and again conclude that, at this early stage of litigation, the City has not, as a matter of law, defeated liability.

1.    *Standard of Review*

"A motion for judgment on the pleadings is the functional equivalent of a general demurrer. [Citation.] Ordinarily, a general demurrer does not lie as to a portion of a cause of action, and if any part of a cause of action is properly pleaded, the demurrer will be overruled." (*Fire Ins. Exchange v. Superior Court* (2004) 116 Cal.App.4th 446, 452.) "Judgment on the pleadings is akin to a demurrer and is properly granted only if the complaint does not state facts sufficient to state a cause of action against that defendant. [Citations.] The grounds for the motion must appear on the face of the complaint, and in any matters subject to judicial notice. [Citation.] The court accepts

---

[12]    While the appeal of the City's judgment on the pleadings was pending, a number of the Bay Boys sought summary judgment in their favor, addressing, among other things, plaintiffs' Coastal Act cause of action against them. Plaintiffs filed a petition for writ of supersedeas to stay the summary judgment hearings, pending resolution of this appeal. On August 31, 2021, we denied the petition. Those summary judgment motions are not before us.

13

as true all material factual allegations, giving them a liberal construction, but it does not consider conclusions of fact or law, opinions, speculation, or allegations contrary to law or judicially noticed facts.  [Citations.]  Appellate courts review the record de novo to determine whether the complaint states a cause of action as a matter of law." (*Shea Hones Limited Partnerhip v. County of Alameda, supra,* 110 Cal.App.4th at p. 1254.)

**2.      *The Coastal Act***

"The Coastal Act 'was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California.  The Legislature found that "the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people"; that "the permanent protection of the state's natural and scenic resources is a paramount concern"; that "it is necessary to protect the ecological balance of the coastal zone" and that "existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this division, are essential to the economic and social well-being of the people of this state . . . ." [Citation.]' [Citation.]  The Coastal Act is to be 'liberally construed to accomplish its purposes and objectives.' " (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 793-794 (*Pacific Palisades*).)

The Coastal Act itself begins by identifying six purposes, which are "the basic goals of the state for the coastal zone." (§ 30001.5.)  These include, "Maximize public access to and along the coast and maximize public recreational opportunities in the coastal zone consistent with sound resource conservation principles and constitutionally protected rights of private property owners." (§ 30001.5, subd. (c).)  "[A] core principle of the

14

[Coastal] Act is to maximize public access to and along the coast as well as recreational opportunities in the coastal zone." (*San Diego Unified Port Dist. v. California Coastal Com.* (2018) 27 Cal.App.5th 1111, 1129; see also *Keen v. City of Manhattan Beach* (2022) 77 Cal.App.5th 142, 145 [the Coastal Act defined the Commission's mission "to protect the coast and to maximize public access to it"].)[13]

A large part of the Coastal Act is its permit scheme. "Under it, with exceptions not applicable here, any person wishing to perform or undertake any development in the coastal zone must obtain a coastal development permit 'in addition to obtaining any other permit required by law from any local government or from any state, regional, or local agency . . . .' "[14] (*Pacific Palisades, supra,* 55 Cal.4th at p. 794.)

"The Coastal Act expressly recognizes the need to 'rely heavily' on local government '[t]o achieve maximum responsiveness to local conditions, accountability, and public accessibility . . . .' [Citation.] As relevant here, it requires local governments to develop local coastal programs, comprised of a land use plan and a set of implementing ordinances designed to promote the act's objectives of protecting the coastline and its resources and of maximizing public access. [Citations.] Once the California Coastal Commission certifies a local government's

---

[13] The amicus brief filed by the Coastal Commission states the policy this way: "Maximizing public access to the coast for all members of the public, and protecting the State's coastal resources, are core purposes of the Coastal Act and central to the mission of the Commission."

[14] Local governments are "person[s]" under the Coastal Act. (§ 30111.)

15

program, and all implementing actions become effective, the commission delegates authority over coastal development permits to the local government." (*Pacific Palisades, supra,* 55 Cal.4th at p. 794.) However, "[u]nder the Coastal Act, the local coastal program and development permits issued by local agencies are not just matters of local law. Instead, they embody state policy. A fundamental purpose of the Coastal Act is to ensure that state policies prevail over local government concerns." (*Kalnel Gardens, LLC v. City of Los Angeles* (2016) 3 Cal.App.5th 927, 940.)

Even though the local government has authority over Coastal Development Permits after approval of its local coastal program, that authority is not absolute. The Coastal Act provides that an action taken by a local government on a permit application may be appealed to the Commission for "developments approved . . . between the sea and the first public road." (§ 30603, subd. (a)(1)). In addition, some lands, including tidelands and "public trust lands" remain outside the initial permitting jurisdiction of the local government; applications for permits for development on those lands must be made directly to the Commission.[15] (§ 30519; *Citizens for South Bay Coastal Access v. City of San Diego* (2020) 45 Cal.App.5th 295, 308.)

Chapter 3 of the Coastal Act sets forth the policies that "shall constitute the standards" by which "the permissibility of

---

[15] Here, the City's local coastal program was certified in 1991, so it obtained original permitting jurisdiction. However, the Commission retained such jurisdiction on "public trust" lands. As we discuss, there is some question on appeal as to whether the developments at issue were within the original permitting jurisdiction of the City or the Commission.

16

proposed developments" are to be determined.  (§ 30200.)  Article 2 of that Chapter is "Public Access."  It provides, among other things, that "maximum access, which shall be conspicuously posted, and recreational opportunities shall be provided for all the people consistent with public safety needs and the need to protect public rights, rights of private property owners, and natural resource areas from overuse."  (§ 30210.)  "Development shall not interfere with the public's right of access to the sea where acquired through use or legislative authorization, including, but not limited to, the use of dry sand and rocky coastal beaches to the first line of terrestrial vegetation." (§ 30211.)  Case authority confirms the importance of preserving public access to the coast.  "[T]he concerns placed before the Legislature in 1976 were more broad-based than direct physical impedance of access.  For this reason, we conclude the public access and recreational policies of the Coastal Act should be broadly construed to encompass *all* impediments to access, whether direct or indirect, physical or nonphysical."  (*Surfrider Foundation v. California Coastal Com.* (1994) 26 Cal.App.4th 151, 158 [concerning the installation of physical devices to collect parking fees; the devices did not themselves impede access, but the fact that one must deposit money into them indirectly did so].)  Another panel of this court held that it was reasonable for the Commission to consider whether a development "would give the appearance" that public land was private land, as that "perception would lead to less public use of that part of the beach."  (*Greene v. California Coastal Com.* (2019) 40 Cal.App.5th 1227, 1235-1236 [when plaintiffs sought to develop their property very close to the seaward property line, it was reasonable for the Commission to consider whether that development would give

17

the appearance that the public beach walk was actually privately owned].)

A Coastal Development Permit must be obtained by "any person . . . wishing to perform or undertake any development in the coastal zone." (§ 30600, subd. (a).) One of the key issues in this case is what is meant by "development" in the Coastal Act. The Act itself provides a definition: " 'Development' means, on land, in or under water, the placement or erection of any solid material or structure; discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste; grading, removing, dredging, mining, or extraction of any materials; change in the density or intensity of use of land, including, but not limited to, subdivision pursuant to the Subdivision Map Act . . . , and any other division of land, including lot splits, except where the land division is brought about in connection with the purchase of such land by a public agency for public recreational use; *change in the intensity of use of water, or of access thereto*; construction, reconstruction, demolition, or alteration of the size of any structure, including any facility of any private, public, or municipal utility; and the removal or harvesting of major vegetation other than for agricultural purposes, kelp harvesting, and timber operations . . . . [¶] As used in this section, 'structure' includes, but is not limited to, any building, road, pipe, flume, conduit, siphon, aqueduct, telephone line, and electrical power transmission and distribution line." (§ 30106, italics added.) We will discuss the italicized language later, in the context of our discussion of whether harassment can constitute development. For present purposes, what is important is that our Supreme Court has acknowledged that "development" under the Act is to be given an

18

"expansive interpretation," and "goes beyond 'what is commonly regarded as a development of real property' [citation] and is not restricted to activities that physically alter the land or water." (*Pacific Palisades, supra,* 55 Cal.4th at p. 796.)

**3.     *The Rock Fort***

As the Rock Fort was indisputably a "structure," by law it qualified as a "development" under the Coastal Act.  (See *LT-WR, L.L.C. v. California Coastal Com.* (2007) 152 Cal.App.4th 770, 804-805 [a structure is a development by virtue of being a structure].)  Therefore, a permit was required.[16]  But the Act requires a permit be obtained only by "any person . . . wishing to perform or undertake any development in the coastal zone." (§ 30600, subd. (a).)  The trial court concluded that, since it was not alleged that the City *undertook the construction* of the Rock Fort, the City was not required to obtain a permit.  As we

---

[16]     We note that it is unclear *from whom* a permit should have been sought for the Rock Fort – that is, whether it was within the City's original permit jurisdiction or the Commission's.  Whether the Rock Fort was on "public trust" land (Commission's jurisdiction) turns on where it was located vis-à-vis the mean high tide line, something not discussed in the pleadings or documents judicially noticed.  Plaintiffs assert that the exact location of the Rock Fort is uncertain on presently known facts, but admit that the Rock Fort was likely located on the non-trust (City jurisdiction) side of the line.  The City, for its part, chose not to address the issue, and argued instead that we are bound to accept plaintiffs' earlier allegations that the trust lands include the area on which the Rock Fort sat.  The question is largely academic.  Even if the Rock Fort was located on City-owned land, subject to City permitting, any City permit would have been appealable to the Commission.  (§ 30603, subd. (a).)

19

explain, case authority postdating the trial court's ruling rejects this interpretation of the Coastal Act. (*Lent v. California Coastal Com.* (2021) 62 Cal.App.5th 812, 832 (*Lent*).)

To properly understand *Lent,* we first consider *Leslie Salt Co. v. San Francisco Bay Conservation etc. Com.* (1984) 153 Cal.App.3d 605 (*Leslie Salt*). The *Leslie Salt* case was concerned not with the Coastal Act, but the McAteer-Petris Act, "which created the San Francisco Bay Conservation and Development Commission (BCDC) and defines its jurisdiction and powers." (*Leslie Salt,* at pp. 608-609.) The Act at issue in *Leslie Salt* required "any person or governmental agency wishing to place fill" on land within the BCDC's jurisdiction to obtain a permit. (*Id.* at p. 612 & fn. 7.) Further, it provided for cease and desist orders for any person "that 'has undertaken, or is threatening to undertake, any activity' that requires a permit . . . ." (*Id.* at p. 612.) Leslie Salt owned property within the BCDC's jurisdiction. Over a number of years, several hundred tons of fill was dumped on its property, without its knowledge and without a permit. (*Id.* at pp. 609-610.) When the BCDC issued a cease and desist order to Leslie Salt, Leslie Salt successfully challenged the order in the trial court, arguing that Leslie Salt was a mere landowner who had not placed the fill itself. (*Id.* at p. 611.) The Court of Appeal reversed, with a two-part analysis. (*Ibid.*)

First, the *Leslie Salt* court held that imposing liability on landowners was within the intent of the Costal Act. "To deny BCDC the power to enforce the act by issuance of cease and desist orders against landowners whose property contains fill placed there by others in violation of the act would 'frustrate the effectiveness of the act' [citation] by materially impairing BCDC's

ability to prevent and remedy haphazard and detrimental filling of the Bay. [Citations.] Unless the responsible person were 'caught in the act' of placing the fill, or the landowner were proved to have authorized its placement by others, BCDC would be unable to order removal of the fill. Such a narrow rendition of BCDC's authority ascribes no significance to a landowner's ability to prevent the placement of fill on his land by others and, if adopted by the courts, would diminish the incentive for landowners to manage their properties so as to reduce the prospect of illegal fill, a result that is also clearly repugnant to the legislative purpose." (*Leslie Salt, supra,* 153 Cal.App.3d at p. 617, fn. omitted.) The court construed the statutory language allowing cease and desist orders against those who have "undertaken or [are] threatening to undertake" prescribed activities as referring "not simply to one responsible for the actual placement of unauthorized fill but also to one whose property is misused by others for that purpose and who even passively countenances the continued presence of such fill on his land." (*Id.* at p. 618.)

The second part of the *Leslie Salt* analysis was an analogy to common law nuisance principles. Under common law, a possessor of land may be liable for a nuisance caused by an abatable artificial condition on its land, if the possessor knows or should know of the condition and has failed to take reasonable steps to abate it. (*Leslie Salt, supra,* 153 Cal.App.3d at pp. 619-620.) "Thus, whether the context be civil or criminal, liability and the duty to take affirmative action flow not from the landowner's active responsibility for a condition of his land that causes widespread harm to others or his knowledge of or intent to

21

cause such harm but rather, and quite simply, from his very possession and control of the land in question." (*Id*. at p. 622.)

In its ruling granting the City judgment on the pleadings, the trial court distinguished *Leslie Salt* because that case did not involve the Coastal Act.

While plaintiffs' appeal was pending, Division Seven of this District recognized, in *Lent*, that the Coastal Act involved "nearly identical statutory language" as the law at issue in *Leslie Salt*, and required the same result. (*Lent, supra,* 62 Cal.App.5th at p. 833.) *Lent* involved a beachfront house, with an easement along the side for public access. The prior owners of the home blocked the easement with new construction prior to selling it to the Lents. When the Commission subsequently asked the Lents to remove the offending structures, the Lents refused. The Commission issued a cease and desist order, and, after a hearing, $4 million in penalties. On the Lents' challenge, the Court of Appeal affirmed the Commission's orders. (*Id*. at pp. 824-826.) The Lents argued that "an owner who merely purchases property containing unpermitted structures, but who did not build the structures, does not undertake activity that requires a permit under the Coastal Act." (*Id*. at p. 831.) The court disagreed, holding, "an owner who maintains a development on his or property 'undertakes activity' that requires a permit for purpose of section 30810,[17] as does an owner who maintains a

---

[17] Section 30810 allows the Commission to issue a cease and desist order if it "determines that any person or governmental agency has undertaken, or is threatening to undertake, any activity that (1) requires a permit from the commission without securing a permit or (2) is inconsistent with any permit previously issued by the commission . . . ."

development inconsistent with a previously issued permit, regardless of whether he or she constructed the development." (*Id*. at p. 832.)

In opposition to the Commission's amicus brief in the present appeal, the City argues that *Lent* is distinguishable on a number of grounds. Specifically, the City claims that *Lent*'s holding is limited to development conducted by a prior property owner in violation of a permit. We are not persuaded. Whether the improper development was conducted by a prior owner, as in *Lent*, or a trespasser, as in *Leslie Salt*, "an owner who maintains a development 'undertakes activity' that requires a permit . . . ." (*Lent, supra,* 62 Cal.App.5th at p. 832.)

The City also argues that *Lent* is distinguishable because *Lent* was a private property owner while the City is a public entity and Lunada Bay is public property. The City argues that this is relevant because Lunada Bay is public and the City does not possess a private landowner's right to exclude others from its property. We reject the distinction. The present action is not concerned with potential exclusion of the Bay Boys from Lunada Bay, but, rather, with their construction of an unpermitted structure on City property, which the City allowed in its location for over 30 years. That the City possessed the ability to remove the fort is conclusively established by the undisputed fact that the City did do so. Moreover, the Coastal Act specifically provides that a city retains its nuisance abatement powers (§ 30005, subd. (b)) and can, in fact, declare, prohibit, and abate nuisances on its property without obtaining a Coastal

23

Development Permit.[18] (*City of Dana Point v. California Coastal Com.* (2013) 217 Cal.App.4th 170, 174.)

In short, we conclude that plaintiffs have sufficiently alleged a cause of action that the City, as landowner, violated the Coastal Act by maintaining the unpermitted Rock Fort on its property for decades.[19] The court therefore erred in granting judgment on the pleadings as to that part of the complaint.

## 4. *Bay Boys Harassment*

The issue of whether plaintiffs state a cause of action against the City for Bay Boys harassment involves two questions: first, whether the alleged Bay Boys harassment constitutes a development under the Coastal Act; and second, whether the plaintiffs sufficiently alleged the City conspired with the Bay Boys to harass non-locals.[20]

---

[18] Indeed, it appears that the City, with its police force and nuisance abatement privileges, may be in a better position to remove unauthorized developments from its property than most private landowners.

[19] The City argues the Rock Fort was removed in 2016. But plaintiffs allege the Bay Boys have "undertaken efforts to rebuild a structure in its place." Based on this allegation, which the City did not address in its motion for judgment on the pleadings, the issue of the Rock Fort has not been resolved.

[20] Plaintiffs do not argue that the City is strictly liable for the harassment on its land, under *Leslie Salt* and *Lent*. We save for another day whether the *Leslie Salt* analysis could be extended to third party conduct, rather than artificial conditions on land.

### A. Harassment May Qualify as a Development Under the Coastal Act

In its order denying judgment on the pleadings, the trial court concluded harassment "is not 'development' under the Coastal Act even if the perpetrator is motivated by a desire to deny access to or use of water." We are mindful of the expansive interpretation of the Act in earlier cited cases and conclude the trial court's reading of the statute is too narrow.

#### 1. Rules of Statutory Interpretation

"The fundamental rule of statutory construction is to ascertain the Legislature's intent in order to give effect to the purpose of the law. [Citation.] We first examine the words of the statute and try to give effect to the usual, ordinary import of the language while not rendering any language surplusage. The words must be construed in context and in light of the statute's obvious nature and purpose. The terms of the statute must be given a reasonable and commonsense interpretation that is consistent with the Legislature's apparent purpose and intention. [Citation.] Our interpretation should be practical, not technical, and should also result in wise policy, not mischief or absurdity. [Citation.] We do not interpret statutes in isolation. Instead, we read every statute with reference to the entire scheme of law of which it is a part in order to harmonize the whole. [Citation.] [¶] If the statutory language is clear, we should not change it to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.] If there is more than one reasonable interpretation of a statute, then it is ambiguous. [Citation.] If so, we turn to secondary rules of construction, including maxims of construction, the legislative history, and the wider historical circumstances of a statute's

25

enactment." (*Kalnel Gardens, LLC v. City of Los Angeles, supra,* 3 Cal.App.5th at p. 938.)

>2.     The Language of the Coastal Act Itself

Consistent with the rules of interpretation, we look first to the statutory definition of "development." That statute, which we have quoted in its entirety above, provides, in pertinent part: " 'Development' means, on land, in or under water, . . . change in the intensity of use of water, or of access thereto . . . ." (§ 30106.) We conclude a change in the access to water brought about by an organized scheme of harassment of, or similar impediment imposed on, those seeking access may be just as much a change in access to water as one brought about by a physical impediment. Accordingly, as the harassment and other conduct alleged here directly interferes with, and sometimes precludes, access to the Pacific Ocean, it can be seen to fall within the language of the statute. Whether there is proof of this state of affairs is left to another day.

The City disagrees, arguing that such a broad interpretation of "development" would result in absurdity in other sections of the Coastal Act. For example, section 30252 discusses "[t]he location and amount of new development," and specifies that "new development" shall maintain public access to the coast by "providing nonautomobile circulation within the development." The City rightly points out that interpreting "development" in this subdivision to include "harassing conduct towards non-residents" would be absurd, as one cannot "provide nonautomobile circulation within" harassing conduct. But this argument proves too much, as other items expressly identified as development in section 30106, would lead to equally absurd consequences when substituted for "development" in section

26

30252.  Development is defined to include the "discharge or disposal of any dredged material or of any gaseous, liquid, solid, or thermal waste."  (§ 30106.)  One cannot "provide nonautomobile circulation within" a disposal of solid waste. Instead, it is apparent that section 30252 was meant to be limited to "[n]ew residential, commercial, or industrial development," as in section 30250, the first section in the same article.

Instead, other provisions of the Coastal Act confirm that "development" includes not just physical modifications, but may include certain conduct as well.  Section 30610 identifies "types of development" which are exempt from permit requirements. These include "[r]epair or maintenance activities that do not result in an addition to, or enlargement or expansion of, the object of those repair or maintenance activities," and "[a]ny proposed development which the executive director finds to be a temporary event which does not have any significant adverse impact upon coastal resources . . . ."  (§ 30610, subds. (d) & (i)(1)). The fact that (1) repair activities that do not expand the object of repair and (2) temporary events which do not have any significant impact on coastal resources are considered "developments" that would, in the absence of this statute, require permits, establishes that "development" does, in fact, include some individual acts on coastal property.  (See *Surfrider Foundation v. Martins Beach 1, LLC* (2017) 14 Cal.App.5th 238, 254 (*Martins Beach*) ["That the Legislature adopted exceptions from the permitting requirement and authorized further exemptions for conduct that would literally constitute 'development' under section 30106 shows the broad definition was meant to be taken literally . . . ."].)

27

### 3. Case Authority Is in Agreement

Case authority has repeatedly held that certain nonphysical activity negatively impacting access to the beach may qualify as development under the Coastal Act.

In *Greenfield v. Mandalay Shores Community Assn.* (2018) 21 Cal.App.5th 896 (*Greenfield*), a community association passed a resolution banning short-term rentals. (*Id.* at p. 899.) When homeowners who wanted to rent out their home challenged the ban as an unpermitted Coastal Act development, the trial court denied preliminary relief, and Division Six of the Second Appellate District reversed. (*Greenfield,* at pp. 899, 901.) The court explained, "Our courts have given the term 'development' '[a]n expansive interpretation . . . consistent with the mandate that the Coastal Act is to be "liberally construed to accomplish its purposes and objectives." [Citation.]' [Citation.] 'Development' under the Coastal Act 'is not restricted to activities that physically alter the land or water.' " (*Id.* at p. 900.) In *Greenfield,* the ban changed the intensity of use and access to residences in the coastal zone, and was therefore a development. (*Id.* at pp. 900-901.) The association "has not erected a physical barrier to the beach but has erected a monetary barrier to the beach. [Citation.] It has no right to do so."[21] (*Id.* at p. 898.) To the same effect is *Kracke v. City of Santa Barbara* (2021) 63 Cal.App.5th 1089, in which a city-enacted ban on short-term rentals was likewise held to be a development, because this limitation on the availability of low-cost housing and tourist facilities was an impediment to coastal access. (*Id.* at p. 1093.)

---

[21] In plaintiffs' second amended complaint, they alleged that Bay Boys harassment included "telling visitors they are too poor or do not pay enough taxes to access Lunada Bay."

This broad interpretation of "development" is not limited to restrictions on short-term rentals. In *Gualala Festivals Committee v. California Coastal Com.* (2010) 183 Cal.App.4th 60, 68, the court held that a fireworks display was a development, because it resulted in the discharge of solid and chemical waste into the coastal zone. The court rejected the argument that the activity must physically alter (or be a necessary precondition to an activity that physically alters) land or water; and also rejected the argument that the physical alteration must be long-lasting and not merely ephemeral. (*Ibid*.)

The most similar case to the present one is *Martins Beach, supra,* 14 Cal.App.5th 238. That case involved a lovely beach, sheltered by cliffs, which could only be accessed by a single road. The public initially had access down the road, and had to pay to park at the beach. When the defendant companies bought the beach and its adjacent land, they shut off public access – closing the gate at the top the road, putting up a sign saying the beach was closed, covering another sign that had advertised beach access, and *stationed security guards* to deny public access. (*Id.* at pp. 244, 245, 247.) The plaintiff brought suit, alleging this was a development which required a Coastal Development Permit. The plaintiff prevailed, obtaining an injunction. (*Id.* at p. 248.) On appeal, the beach owners argued that closing the gate and painting the sign did not constitute development. The court disagreed. "[D]irectly contrary to appellants' assertions, 'the Coastal Act's definition of 'development' goes beyond 'what is commonly regarded as a development of real property' [citation] and is not restricted to activities that physically alter the land or water [citation].' [Citations.] What is important for purposes of section 30106 in the present case is that appellant's conduct

29

indisputably resulted in a significant decrease in access to [the] beach." (*Id.* at p. 252.)

The City points to the physical impediments in *Martins Beach* (the closing of the gate, the posting of the no access sign) to argue that the decision did not turn on the human activity (the security guards) blocking access. But the *Martins Beach* holding did not turn only on the closed gate and posted sign being physical structures. "It is the totality of appellants' conduct in closing access to Martins Beach that the court concluded fell within the definition of development." (*Martins Beach, supra,* 14 Cal.App.5th at p. 252, fn. 11.) There is no structures versus conduct dichotomy for "development" within the meaning of the caselaw. Structures are development, and conduct may be too, if it impacts access. (See *City of Dana Point v. California Coastal Com., supra,* 217 Cal.App.4th at p. 174, fn. 3 [both the installation of gates blocking pedestrian trails, and an ordinance limiting the hours of operation of those trails, constituted development].)

Applying this law to the totality of the alleged conduct of the Bay Boys, plaintiffs have claimed Coastal Act development. In addition to constructing the Rock Fort and using it as their base of operations, plaintiffs alleged that the Bay Boys, in an effort to restrict access to Lunada Bay to locals, engaged in the following conduct: physically obstructed outsiders' access to the beach trails, threw rocks at them, punched them, ran them over with surfboards in the water, stole their belongings, vandalized their vehicles, and threatened then with serious injury—sort of an informal band of self-appointed, violent security guards. If closing a gate and posting a security guard constitutes development in *Martins Beach*, so may setting up headquarters

30

at the Rock Fort, physically obstructing trail access to the beach, and intimidating outsiders with word and deed.

The court in *Martins Beach* found the plain language of definition of "development" to be unambiguous, thus it was unnecessary to turn to the legislative history. (*Martins Beach, supra,* 14 Cal.App.5th at p. 255, fn. 11.) We reach the same conclusion here.

B. *Plaintiffs Sufficiently Alleged Conspiracy*

Given that we have held plaintiffs sufficiently alleged an unpermitted "development" in the Bay Boys' denial of access to the beach, the sole remaining question is whether plaintiffs sufficiently alleged City liability for this conduct. Plaintiffs alleged the City was liable because it conspired with the Bay Boys.

Parties can, in fact, be liable for Coastal Act violations under the doctrine of conspiracy. (*Rickley v. Goodfriend* (2013) 212 Cal.App.4th 1136, 1158.) Conspiracy liability is not limited to tort; defendants may be liable if they agree to engage in conduct that violates a duty imposed by statute. (*Ibid.*) "Conspiracies are typically proved by circumstantial evidence. [Citation.] '[S]ince such participation, cooperation or unity of action is difficult to prove by direct evidence, it can be inferred from the nature of the act done, the relation of the parties, the interests of the alleged conspirators, and other circumstances.' " (*Id.* at p. 1166.)

Here, plaintiffs have alleged the following: Many City residents and the City Council do not want outsiders in the City; at least one City official stated that City residents wanted to keep outsiders away; the Bay Boys had a decades-long practice of blocking access to Lunada Bay, both by words and acts; the City

31

was aware of this conduct and complicit in it; the former police chief agreed to look into the situation and then "backed off"; the City had a "coz[y]" relationship with the Bay Boys; the City did not enforce its laws against the Bay Boys; instead, the City itself acted to exclude outsiders from the beach by targeting them with traffic citations, parking tickets, and towing.

Whether plaintiffs will be able to establish these allegations when put to the task is not before us now. At this point, they have sufficiently alleged an actionable conspiracy in which the City has participated.

### DISPOSITION

The judgment is reversed. The City shall pay plaintiffs' costs on appeal.


                                        RUBIN, P. J.

WE CONCUR:



                    MOOR, J.



                    KIM, J.